12 525
74 360

AMBROSE HENDERSON v. THE STATE.

Where the assault was admitted and an attempt was made to justify it by proof that the person assaulted was, at the time, in the act of setting fire to a house of the defendant, in the night time, accompanied by the statement that the person assaulted, was not recognized by the defendant until after the assault was made, it was held that proof that the person assaulted was a quarrelsome, pugnacious man was properly excluded.

It is not error to refuse to give a charge the substance of which has been already given; at least, where it does not appear probable that the jury may have failed to apprehend the general charge.

We deem it unnecessary to revise the charge given, in the matters complained of, for the reason that it is very evident, we think, that the jury were not, and cannot have been misled to the prejudice of the defendant, by reason of the supposed erroneous rulings.

Where the defendant is indicted for an assault with intent to kill, and the jury brought in a verdict of guilty, and the jury being polled, one of the jurors said he assented to the verdict, but that he had doubts as to the intention of the defendant to kill at the commencement of the assault, but thought before the difficulty got through, he intended to kill, and declined to consider further or to disagree to the verdict, it was held that the verdict was properly received.

See this case as to credibility of witnesses, and burden of proof in criminal cases, where the fact is admitted.

It is not a good ground for a new trial in a criminal case, that it has been discov‑ ered since the trial, that the place where the offence was committed is not within the county. (But it was said to have been an admitted fact, that the county where the trial was had, claimed and exercised actual jurisdiction over the place.)

Appeal from Shelby. Indictment for an assault upon Tyre Buckley with intent to murder, on the 4th day of July, 1853. Richard Ratliff, a physician, stated that he went to see Tyre Buckley on the morning of the 5th July, 1853, at the house of Wilcox, having been sent for; found seven wounds, three in the back near the spine, which did not indicate from the mode in which the flesh was cut, that they were direct thrusts, inflicted by any one behind, but they indicated that the flesh had been cut from below upwards; they might have been in‑ flicted upon him either while erect or in a squatting position or on his knees; there were two wounds on his hand and wrist, one of them a cut across the inside of the hand, and one was

a thrust through of the knife, through the arm just above the wrist, from the inside to the outside, passing through the arm, which last cut a vein and caused a loss of some blood; there was one other wound on the left side, just above the hip and below the ribs, which passed into the cavity, but did not cut any of the intestines; that was the most dangerous wound and would have killed him if the intestines had been so distended as to have been injured, or if the blow had been so violent as to have penetrated them; did not probe the wound; witness stated it as his opinion from the character and appearance of all these wounds they were inflicted by some one in front of Buckley; the other wound was situated in the fleshy part of the hip in the rear of his person; this one, from its appearance and position, he judged to have been inflicted while Buckley was in the act of running from the person inflicting the wounds; one of the wounds in the back was directly over the spine, and had it been directed with sufficient force to penetrate the spinal column, would have produced death; could not say with absolute certainty what was the position of the parties when the wounds were inflicted; supposed the knife was something over the common sized pocket knife.

Henderson and Buckley were married to sisters, and the cutting took place in the night-time, at a Mrs. Tidwell's, who was a cousin to the wives of Henderson and Buckley, and who lived in a house belonging to Henderson. All the parties were near neighbors. Buckley testified that he was returning home that night, dark night, misting rain, lost his way, came to Mrs. Tidwell's, horse fell over some logs, made a noise by groaning, Mrs. Tidwell ran off, witness squatted down by the remains of a fire in the yard and was attempting to kindle a light, when he was attacked by the defendant from behind, and with difficulty made his escape from the defendant, who remarked that he had got him where he wanted him. There were discrepancies in the testimony of this witness, contradictory statements by himself made to others, and falsehood in some unimportant particulars, which rendered his testi-

mony unworthy of credit.   Mrs. Tidwell testified that Buckley came near her house and alarmed her by the hideous noises which he made, so that she, in ignorance who it was, took her children and started off towards Henderson's mill, a quarter of a mile distant; that finding no one at the mill, she continued on towards Henderson's house, and presently met Henderson going to his mill to grind, whom she informed of what had occurred; she went back to the mill, while Henderson went to see what or who it was that had alarmed her; that next morning she noticed a couple of chunks of charred wood near one of the corners of the house, that were not there the evening before.

The statement of Henderson was that when he arrived at the house, after leaving Mrs. Tidwell, he saw what he took to be a negro, attempting to kindle a fire under one corner of the house; that as he approached, the individual attacked him; that in the scuffle he, the defendant, got out his pocket knife and cut him several times, until he ran away, and that it was not until the individual had run away and then stopped and called out to defendant, that defendant recognized him to be Buckley.

There was testimony which showed that Buckley and Henderson were not on friendly terms; that Buckley and Mrs. Tidwell were not on friendly terms; that Henderson was in the habit of running his mill at night; that Mrs. Tidwell's husband had not been living with her for a couple of years. The defendant offered to prove that Buckley, when intoxicated, was quarrelsome and pugnacious, it being already proved that he was intoxicated on the evening of the 4th of July, 1853; but the Court excluded the evidence.

It is not important, in view of the disposition which was made of the objections on account of them, to state the charges given and refused.

There was a bill of exceptions, as follows:

Be it remembered that when the jury came into Court, after having been sent out to consider of their verdict in this case,

they returned the following verdict: "We, the jury, find and "sentence the defendant Henderson to the penitentiary one "year. Richard Hooper, foreman." The Judge told the jury that he could not receive the verdict, and asked the jury if they intended to find the defendant guilty of an assault and battery or of an assault with intent to murder. The jury replied that they had found him guilty of an assault with intent to murder; and the Judge directed that the verdict be put in legal form; and after the same had been written out by the presiding Judge as afterwards returned by the jury, and before the same was signed by the foreman, the defendant by his counsel asked that the jury might be polled before the verdict thus written out by them should be received by the Court. The Court ordered the list of jurors to be called, and Richard Hooper having been called, was asked by the presiding Judge, "Are you satisfied with the verdict," (meaning the one written out for the jury,) to which Richard Hooper answered, "I am not fully satisfied in all respects. Two of us was in "favor of finding the defendant two hundred dollars, but a "majority were the other way, and we submitted to the ma-"jority." John Farrar, one of the jurors, stated to the Court, that he was the other juror who agreed with Richard Hooper. The defendant's counsel then moved the Court verbally, to send out the jury to consider of their verdict. The Court not having sent them out, but the jury remaining in the house, the Judge asked Richard Hooper whether he now agreed to this as his verdict, to which Richard Hooper answered, "Yes, "in the way; he agreed with the majority to bring in the "verdict and was still willing to return it, because he was "not willing to stand out against the majority; that he was "satisfied that Henderson was guilty of an assault and bat-"tery, but had doubts about his intention to murder; he had "considered the matter all over; had his mind made up be-"fore he left the jury box, and did not think it could be "changed; he had agreed with the majority to return the ver-"dict, and was still willing to do it." The counsel for the

defendant asked the Court to send out the jury, that the defendant (without the hearing of the jury) might present to the Court a question of law concerning the reception of the verdict; and the jury were sent out for that purpose. The defendant's counsel then asked the Court to put to each juror the question in such form as to test the mind of each one upon the main issue of guilty or not guilty of an assault with intent to commit murder; to which the District Attorney made no objection; and the Court having had the jury recalled, propounded to Richard Hooper, he being first on the list, the following question : " Are you satisfied beyond all reasonable " doubt that Ambrose Henderson is guilty of an assault with " an intent to commit murder on the person of Tyre Buckley," (which mode of putting the question defendant's counsel approved.) To which Richard Hooper answered, "I am not fully satisfied." The Judge then handed Richard Hooper, who was the foreman, the papers in the case, and told the jury they must retire and consider of their verdict; that in a case of this magnitude it was important they should agree, and that to agree it was necessary that every juror should concur in the material ingredients of the offence ; that if the jury wished any further charge upon the law, he would give it to them. To which Richard Hooper answered that " he understood the " whole of the charge and was satisfied about the law, but that " he had doubts about the intention to commit murder, and he " did not know he could ever agree about that, but he was will- "ing to return the verdict as it is." The Judge then asked him if he was prepared to say he was satisfied to return the verdict, and Hooper answered in the affirmative, whereupon the Judge again propounded the question to Hooper, " Are you satis- "fied beyond all reasonable doubt, that Ambrose Henderson " is guilty of an assault with an intent to commit murder upon " the person of Tyre Buckley ?" To which Richard Hooper answered " I have no doubt as to the assault and battery, " but have doubts whether it was his intention to kill at the " commencement of the assault and battery, but think before

34

" the difficulty got through he intended to kill." And John Farrar having expressed his answer in the same way, and the same question having been answered by the other jurors in the affirmative, the Judge told Richard Hooper that if he would sign the verdict as it had been written out, he would receive it, and upon the same being signed and handed to the Judge, the defendant's counsel again objected to the reception of the verdict and the discharge of the jury, which objections were overruled by the Court.

There was a motion for a new trial, one of the grounds of which was that it had been discovered by the defendant and his counsel that the place at which the defence was alleged to have been committed, was in Sabine county, which fact was supported by several affidavits. The motion was overruled.

*O. M. Roberts*, for appellant.

*Attorney General*, for appellee.

WHEELER, J. Several grounds have been urged for reversing the judgment in an argument on behalf of the appellant of surpassing ability. But an attentive consideration of the case as presented by the record, has disembarrassed it, to our minds, of its apparent difficulties. In order to its disposition it will suffice to notice briefly those of the errors assigned, which have been mainly relied on ; and it is proposed to do little more than state our conclusions.

It is insisted that the Court erred in refusing to admit evidence of the character of Buckley, the party assaulted, as a quarrelsome, pugnacious man. To this it must be answered that, according to the defendant's own statements and the version of the evidence on which his defence is rested, the character of Buckley could have had no influence on his conduct, for the reason that at the time of the assault the defendant did not know him. To admit the proposed evidence on the ground insisted on, that is, as affording presumptive evidence

that the party injured was the aggressor, when he was the only party who appears to have sustained any injury in the rencounter, would be going quite too far, and further, it is believed, than any principle or precedent would warrant. It would be to resort to an extremely fallible and dangerous test of truth in such a case ; to substitute for legal evidence, very remote and merely possible conjecture. Where a person is found to have such marks of violence on his person, confessedly inflicted by the hand of another, it can scarcely be seriously contended, that it would be either philosophical or legal to refer them to the character of the sufferer as their cause. We think the proposed evidence was properly rejected.

It is further insisted that the Court erred in refusing to give the third instruction asked by the defendant. And we do not doubt the general correctness of the legal proposition, which the instruction was intended to embody. But we think the Court might well refuse it in the terms in which it was asked. It assumed what the evidence, we think, did not warrant. It is scarcely a supposable case that a knife so used as to inflict the wounds, which it is indisputably proved were inflicted, could have been used, as the instruction asked supposes, "not in a way to indicate a reckless disregard of life and wanton cruelty;" unless under particular circumstances, which do not appear in this case, but which should satisfactorily appear, to warrant the assumed hypothesis, or to excuse or alleviate the crime of having made such use of a deadly weapon. And, indeed, the ground on which the defence appears to have been mainly based, of the supposed attempt by the party assaulted to commit the crime of arson, seems to us so devoid of any solid foundation in the evidence as scarcely to have deserved to be seriously entertained as a defence. It can scarcely be regarded otherwise than as a mere fabrication and pretence, which the Court and jury might not improperly have rejected altogether ; and which, it is very evident, the jury did not credit. If, however, the accused was entitled, under the evidence, to have the benefit of this defence, (since,

·whether legitimately or not, it was before the jury,) it was ac-·corded to him as fully as he could, with the semblance of reason claim, in the general charge and in the instructions given at his request.

It was incumbent on the defendant seeking to justify the use of such violence in defence of his person, habitation, or property, to make out satisfactorily in evidence, the facts on which he relied to justify or extenuate. From such acts of violence, the law presumes malice ; and it devolved on the defendant to repel this legal inference, by showing circumstances of justification, excuse or extenuation. If such circumstances existed, but were not susceptible of proof, that was his misfortune. The law demands evidence, and will not rest its conclusions on conjecture. The Court can only be required to charge the law applicable to a state of case which it may be supposed the jury may probably, or at least rationally adopt as the conclusion of fact deducible from the evidence on which to rest their verdict. We think, as presented, the instruction asked was not improperly refused.

We deem it unnecessary to revise the charge given, in the matters complained of, for the reason that it is very evident, we think, that the jury were not, and cannot have been misled to the prejudice of the defendant, by reason of the supposed erroneous ruling.

Again, it is insisted that there was not a legal verdict, because, it is said, all the jurors did not yield their free assent.

The question is whether, under the circumstances, the Court should have received the verdict ; and, though we have felt some hesitancy on this point, our conclusion is that it was not error to receive it. The juror was fully admonished by the Court of his duty. But he would neither consider further of his verdict, nor would he disagree to the verdict of his fellow jurors, but assented to it. Yet he persisted in saying that he had doubts as to the intention of the accused to commit the crime of murder ; but he yielded to the majority. Whether those doubts should have prevented the juror from assenting

to the verdict, depended, of course, upon their strength; and that was a question which he alone could determine. While the law respects individual judgment, and will not receive a verdict to which every juror has not yielded his voluntary consent, it cannot prevent him from yielding, if he will, his own judgment, in deference to the opinions of his fellows. And it would, perhaps, be impossible to administer the law through the means of jury trial, if, in the numerous cases which involve complicated and difficult questions, upon which honest minds may differ in their conclusions, each juror should persist in the conclusions of his own judgment, and would pay no deference to the opinions of his fellow jurors. The law does not require this obstinacy in the maintainance of individual independence of judgment. It expects jurors to compare opinions, and yield such deference as they conscientiously can to the opinions of each other, in order to concur if possible in a verdict. And formerly the practice was to constrain juries to agree; and for the purpose of accelerating unanimity, they might be kept without meat, drink, fire or candle, till they were unanimously agreed; and if they held out, and could not agree, though they were not to be threatened or imprisoned, the Judges might carry them round the circuit from town to town in a cart. (3 Bl. 375.) Though these usages have become obsolete, still it is not compatible with the nature of the duty that jurors should in all cases obstinately persist in maintaining perfect independence of individual judgment. Perhaps the only difference between the present and the case of most findings of juries is, that the juror had the candor, and felt it a duty when interrogated to state the fact that he did act in deference to the opinion of his fellow jurors; while another might not feel it his duty, as it certainly would not be, to make the disclosure. In the case of The Commonwealth v. Drew, (4 Mass. 398–9,) it was objected that one of the jury did not agree to find the prisoner guilty of murder, but only of manslaughter; and that he concurred in the verdict from a mistaken sense of duty, believing

he must assent to the verdict of the majority. The Court declined to hear the inquiry, observing that if it were proved, it could not avail the prisoner on any legal principles, by which alone the Court must be governed.

It is further insisted that the principal witness for the prosecution was not entitled to credit; that his testimony is contradictory, and ought not to be believed ; and that the verdict for this cause should have been set aside and a new trial awarded. It is to be regretted that there is too much reason to doubt the veracity of this and another witness who testified to a personal knowledge of matters immediately connected with the rencounter. But there is certainly quite as little reason to credit the account given by the defendant and his principal witness, as that given by the witness for the prosecution. If his situation was such as to suggest to him a strong motive for withholding the truth, so, it would seem, was that of the principal witness for the defendant. And if the narration of the former should be rejected as wholly unworthy of credit, so should that of the latter ; and it is probable both should be rejected. But it is to be borne in mind that it is not Buckley, the party assaulted and the witness, who is seeking redress for his wrongs. If it had been left to his option, perhaps this case would never have been the subject of a judicial investigation. But it is the State that is demanding satisfaction for the violated law. And there are certain facts, which are brought to light by the testimony of credible witnesses, about which there is no dispute, and can be no mistake ; and which are amply sufficient to justify holding the defendant responsible for the outrage which they show to have been committed, until he shall have made good his justification or excuse by satisfactory evidence. These are the wounds inflicted upon the witness, confessedly by the hand of the defendant, of such a nature as manifests an intention to take life. The witness may have sworn falsely, but those wounds are facts ; they address themselves to the evidence of the senses ; they " cannot lie." It may be true, therefore, that the wit-

ness was not worthy to be believed. The jury may not have believed, it is not necessary that they should have believed him. The verdict does not rest on his unsupported testimony. There is evidence ample besides it.

Finally, it is insisted that a new trial ought to have been awarded, on account of the newly discovered fact that the offence was not committed within the county. It is believed that there has been no instance of the grant of a new trial on such a ground as this. It is a principle governing applications for new trials on the ground of newly discovered evidence, that it must be such as reasonable diligence on the part of the defendant could not have discovered at the former trial. (Whart. Am. Cr. L. 657, 659, *et seq.*) It cannot be that a fact so notorious as a county boundary, or the evidence to prove it is of that character. Besides, it is an admitted fact that the county of Shelby claimed and exercised actual jurisdiction over that territory.

We are of opinion that there is no error in the judgment, and it is affirmed.

Judgment affirmed.