SAM CHASE v. THE STATE OF MISSISSIPPI.

1. PLEA IN ABATEMENT NOT REPLIED TO — RECITAL IN THE RECORD OF ISSUE JOINED, NOT CONTRADICTED, WARRANTS PRESUMPTION OF ISSUE JOINED. — A recital in the record of the trial of a capital case that defendant "filed his said two pleas in abatement, upon which the district attorney joined issue and the court tried the issue on the said pleas in abatement, there being nothing in the record contradicting this recital, and no replications in the record, is sufficient to raise the presumption that issue was joined upon the pleas.

2. PLEA IN ABATEMENT NOT INVOLVING QUESTION OF FACT DOES NOT REQUIRE TRIAL BY JURY. — It is not error for the court, without a jury, to dispose of pleas in abatement, which involve no question but an inspection of the record.

3. GRAND JURY — ORGANIZATION OF — WILL BE PRESUMED TO HAVE BEEN LEGAL WHERE RECORD SHOWS ORGANIZATION UNDER SUPERVISION OF THE COURT. — Where the record shows the organization of a grand jury under the supervision of the court, and it does not affirmatively appear to the contrary, it will be presumed that the grand jury was duly and legally organized.

4. TRIAL FOR MURDER — PRACTICE — NOT ERROR PER SE FOR COURT TO SET ASIDE JUROR UNTIL EXAMINATION OF OTHER JURORS. — During the impan-

eling of the jury for the trial of the accused, on a charge of murder, one of the special *venire*, after a partial examination touching his qualifications, without being challenged by either party, was set aside by the court to await the examination of other jurors, and, after some time, was again called, when he was peremptorily challenged by the state. *Held*, not to be *per se* error, and it not appearing that accused had sustained any injury from it, the judgment will not be disturbed on that account.

5. GREAT BODILY HARM WHICH WILL JUSTIFY A HOMICIDE WITH DEADLY WEAPON — BLOWS WITH FIST AND FOOT WILL NOT. — Mere blow with fist and feet do not justify the party assaulted in taking the life of his assailant, by the use of a deadly weapon.

6. EVIDENCE — CHARACTER OF DECEASED ON TRIAL FOR MURDER — GENERALLY INADMISSIBLE — BUT IN SPECIAL CASES IT IS ADMISSIBLE. — Evidence of the character of deceased as a general rule is inadmissible, but there are exceptional and special cases in which it is admissible.

7. MISCONDUCT OF JUROR — NEW TRAL — CASE UNDER REVIEW. — During the impaneling of the jury in a case for murder, one of the jurors, who had been selected and sworn, and had taken his seat in the box, remarked in whisper to a by-stander, that his wife was very sick and he desired the by-stander to intercede with the judge for his discharge, to which a reply was made that it was too late, and this was all that was said. *Held*, not to be ground for a disturbance of the verdict.

8. CASE UNDER CONSIDERATION — JUDGMENT AFFIRMED. — The court reviewed the evidence and announced the conclusion that it fully sustained the verdict, and affirmed the judgment of the circuit court.

ERROR to the circuit court of Issaquena county. SHACKLEFORD, J.

*F. & L. B. Valliant,* for plaintiff in error.

The record shows that the defendant in the court below, by leave of court, filed two pleas in abatement to the indictment upon which it is alleged, in the minutes of the court, that the district attorney joined issue ; but there are no replications filed and nothing to show what the issue was.

There was but one way to join issue, and that was by filing replications to the pleas, which was not done, and those pleas stand now not disputed on the record. It is true, the defendant afterward entered a plea of not guilty, but this he did under the judgment of the court overruling his pleas in abatement, requiring him to answer further.

The court "tried the issue joined," according to the minutes on the two pleas in abatement, and found for the state. Even if the district attorney might have answered

the pleas orally, the defendant was entitled to a trial of the issue by a jury, and the court had no right to try the issue even with the consent of the prisoner. 1 Bishop on Crim. Pr., § 759. But, admitting even that there was an issue, and the court had a right to try that issue without a jury, still the finding was wrong and contrary to the evidence, which brings us to the consideration of the third error assigned. In the minutes of the court is a copy of the order of the board of police appointing the grand jury, with the sheriff's return thereon, showing those whom he had summoned, and the minutes, also, show that a certain number of those so summoned to serve as grand jurors appeared and answered to their names, and the names of such as so appeared are given, but who or how many were selected to serve as grand jurors the record does not show. The minutes pursue the usual form, "and thereupon the following named persons, after being examined in open court, touching their qualifications as grand jurors to the present term, and being found to be competent and suitable persons, over the age of twenty-one," etc., "were elected," etc., but there the record stops and does not give us the names of any who were so elected, and does not tell us how many were so elected. It is possible that the record would have been sufficient to establish the legality of the grand jury if it had given the number of persons selected, but when it leaves us in doubt as to whether there were one or more, it is, we think, very defective.

Theodore Fitler is named as the foreman of the grand jury, and we have nothing in the record to show that there was any other grand juror but himself. The record of the court relating to the impaneling of the grand jury at that term is made a part of the record in this case by bill of exceptions, and by that record we insist that there was no grand jury for that term, for the record shows that the jury was blank except as to Theodore Fitler.

But the record does not show that this indictment was presented to the court by the grand jury in the presence of at

least twelve of the said jury, including said foreman, and marked "filed," and such entry made and signed by the clerk. This was necessary ; see Rev. Code, 1857, p. 614, art. 257. The defendant made this objection to the indictment before trial, both on the plea in abatement and objection to reading the indictment to the jury, and, although the entry might have been made at any time before trial, yet it was not done even after attention was called to the omission, and we can but infer that the indictment was not presented in accordance with the statute above quoted, or else the record would have been amended to show that fact. For these reasons the pleas in abatement should have been sustained and the objections which raised the same question in another form should have been sustained. This objection was to the reading of the indictment to the jury and to being tried on the indictment as set forth in the fourth error assigned.

The fifth error assigned is, that the court erred in ordering one of the *venire* L. Mayfield, to stand aside after he had been regularly called, sworn to answer questions touching his qualifications as a juror, had had several such questions propounded to him by the district attorney, to which said Mayfield had given answers, without having decided the question touching his qualifications as a juror and without tendering him to the defendant, and without his having been challenged by either party.

At the time Mayfield was ordered to stand aside, the district attorney had made no peremptory challenges, and the defendant had made four, and afterward, when eleven of the jurors had been elected, sworn and impaneled, and the rest of the special *venire* had been exhausted, and the district attorney had made three peremptory challenges, and the defendant made six, Mayfield was again called and peremptorily challenged by the district attorney. The district attorney was allowed to hold Mayfield in reserve, and, if he could not do better, he would take him, but he evidently preferred just then to look farther. If this is to be adopted as a rule, the district attorney may pick over the list of

special *venire* summoned until he gets those to suit him, and force the defendant to be tried by a jury of the district attorney's choosing, or exhaust his challenges. The district attorney was safe in exercising one of his peremptory challenges when there were already eleven jurors in the box, and he had two peremptory challenges in selecting the remaining juror. This was unfair to the prisoner. May-field was one of the special *venire*, and when called the prisoner had a right, then and there, to have the court pass upon the qualifications of said juror.

The sixth assignment is, "the court erred in giving the first instruction asked for the state." The court instructs the jury that "no mere words, no matter how provoking, will justify the killing of a human being, and if the jury believe from the evidence that the deceased intentionally, not in the sudden heat of passion, gave the fatal blow to Amos Estelin that caused his death, and at the time of killing the deceased by the accused, he was in no immediate danger of loss of life or limb, then the killing would be murder, and the jury will so find." This instruction is open to two objections: the first part, that no mere words, no matter how provoking, will justify the killing, etc., is an abstract proposition of law, and not at all applicable to this case. There is nothing at all in the evidence to show that the deceased used any insulting or provoking language to the defendant that produced the difficulty. On the contrary, it was the defendant who called the deceased a liar, upon which the deceased made the attack on the defendant and struck him a blow in the breast with his fist, and kicked him in the stomach with his foot.

But the jury would gather from this instruction that the court thought that the defendant made the attack in consequence of some provoking language of the deceased, which is not true. But the second and principal objection to the instruction is, that it is not law, in that it limits self-defense to defending one's self against "loss of life or limb." The language of the statute is, that the killing

is justifiable, when committed in the defense of such person, etc., when there shall be reasonable ground to apprehend a design to commit a felony (Rev. Code, 1857, p. 601), or to do some great personal injury, and there shall be imminent danger of such design being accomplished, etc. The court, in this instruction, limits the meaning of the language of the statute "great personal injury," to "loss of life or limb," which, we think, is an unwarranted limitation. The evidence in this case is, that the deceased was a much more powerful man than the accused ; that the accused was standing on the ground and the deceased on the gallery elevated about eighteen inches, and, with this advantage of position, the deceased attacked the defendant, striking him with his fist, and at the same time kicking him with his foot in the stomach. We cannot imagine a greater "personal injury," short of death, than might be inflicted by a powerful man, kicking a weaker one in the stomach, especially when the attacking party has the advantage of an elevation of eighteen inches. Under the instructions of the court, a man can defend himself only when "life or limb" is in danger, and if he sees a blow aimed at him that may entail a life-long disease, misery and suffering, he cannot defend himself against it.

The seventh assignment of error is the second instruction for the state : " If the jury believe from the evidence that Sam Chase entered into the fight with the deceased, Amos Estelin, armed with a deadly weapon, intending to use the same, if necessary, to overcome his adversary, then the killing of the deceased would be murder."

While this may be an abstract proposition of law, yet it was inapplicable to the evidence in this case and could but prejudice the jury against the defendant, by presenting to them, under the sanction of the court's instruction, the suppositious case of the defendant's "entering into the fight armed with a deadly weapon, intending to use it if necessary," etc. The words used in the instruction, "entered into," "armed," "intending," in the sense and con-

nection in which they are there used are inseparably con-
nected with the idea of volition and premeditation, and
"armed" in this sense also means prepared. If the defend-
ant, anticipating a difficulty with the deceased, had delib-
erately prepared himself for the meeting by "arming"
himself with a knife and, having done so, should then,
"intending to use it," "enter into the fight," the instruc-
tion would have been proper. Or, if there had been a ques-
tion as to whether or not the defendant had so acted, the
instruction might have been given, but there was not a par-
ticle of evidence to suggest such a question to the jury.
There is nothing to show that the accused had ever been
informed that the deceased suspected him of improper
behavior toward his wife. Not an angry word had ever
passed between them before. The complaint of Amos, that
Sam was behaving improperly toward Amos' wife, was not
made to Sam, but to Sam's father, and for aught that
appears in the evidence, Sam was first informed of it when
he was called back by the witness Malinda Henderson.
Sam was going in pursuit of one Thornton to get some tools
from him with which to mend a cart ; he had passed Amos
and had gone some distance when he was called back, and
then, for the first time, was made aware of the accusation
against him,. which he indignantly denied ; whereupon he
was quickly and fiercely assaulted before retreat was pos-
sible. The accused threw up his hands, already containing
the knife, as both witnesses say, not in the act or manner of
striking a blow, but in the manner of warding off the blow of
Amos, and in thus warding off the blow of Amos the fatal
stab was given. Now, when did the premeditation or prepa-
ration occur. It is not every possession of a knife, though
that knife may be in itself a deadly weapon, that will consti-
tute the possession an "armed" man. "Armed" means,
possessed of an instrument designed to be used as a weapon
of offense or defense. We think it improper to call a man
"armed" when he is in the peaceful possession of an

instrument, the ordinary use of which is peaceful, although it may be converted into a weapon.

The eighth assignment of error is the third instruction for the state : "If the jury believe from the evidence that the accused killed the deceased without malice, but from sudden passion, then the crime would be manslaughter." This is error, inasmuch as it omits the very important qualification, "and not in necessary self-defense." Rev. Code 1857, p. 602, art. 176.

Ninth assignment of error is in modifying first instruction for defendant. This instruction as asked was in the very language of the Statute, Rev. Code of 1857, p. 601, and should, therefore, have been given. The limitation of the meaning of "great personal injury," which the modification of the instruction makes we think is unwarranted. According to the modification, the injury must be threatened with a deadly weapon ; or, in other words, "great personal injury" cannot be inflicted by a powerful man, elevated eighteen inches in position, kicking a weaker one in the stomach with his foot. Tenth assignment of error is the modification of the defendant's second instruction. We think this modification presents the same physiological inconsistency as is contained in the last-named modification. Eleventh assignment of error consists in excluding testimony of character of deceased for peace or violence. As a general rule the character of the deceased cannot be called in question as an independent fact to justify the killing, for the reason, as all the law-writers say, that it is as much against the law to kill a bad man as to kill a good man ; but, when the defendant relies for his defense on proving certain hostile demonstrations made against him at the time of killing by deceased, we think the character of deceased for peace or violence essential to a proper understanding of the meaning of those acts. 1 Arch. Cr. Pr. & Pl. 902, citing Monroe v. State, 5 Mo. 85 ; McDaniel v. the State, 8 Smedes & Marsh. 401. The character of the deceased in this particular is also very essential to a proper consideration of the question

raised by the evidence as to whether the deceased died of the wound alleged to have been given or of heart disease. 11 Beck's Med. Jur.(6th ed.) 43. Twelfth assignment: The court erred in overruling the defendant's motion for a new trial. We have already considered the principal causes why a new trial should have been granted in considering the assignment of errors from the fifth to the eleventh, both inclusive. Another cause is the improper conduct of the juror Powell, who it is shown by the affidavits read in support of the motion, held some conversation in a whisper with a person not a member of the jury or an officer of the court, which neither the court nor the defendant nor his counsel could hear, after the said juror had been elected, sworn and had taken his seat in the jury box.

The affidavits of the juror, and that of the gentlemen with whom he was conversing, were read to show what that conversation was, but this was improper. The court has so recently adjudicated this point that it is useless for us to do more than allude to it. Boles v. the State, 13 Smedes & Marsh. 398 ; Woods v. the State, 43 Miss. 364.

The last reason that we deem it proper to urge is, that it is doubtful from the evidence whether the defendant killed the deceased or not. The evidence is, that Sam was standing on the ground with one foot elevated on the gallery ; Amos ran up to Sam and struck him with his fist and kicked him with his foot at the same time, whereupon Sam threw up both of his hands, in one of which he had the knife with which he was picking his teeth when the attack was made on him ; both witnesses say that Sam's action seemed to them the warding off the blow of Amos, and not the striking of a blow. The witnesses both say that the accused did not draw back his hand or strike a blow, but that he threw up his hands in the manner of warding off the blow of Amos, and that Amos immediately stepped back and said he was cut.

Upon examination of the wound, it was discovered that it was about one-half inch long and very near the right

nipple. Neither of the witnesses nor any one else probed the wound. They only saw, what was to the eye, scarcely more than a scratch near the right nipple. Amos died in about fifteen minutes. What is more improbable than that he died in fifteen minutes of a stab in the right nipple with a small knife blade? If the stab had been in the left side it is very probable that it would have produced death so quickly, but we think it would be a miracle if such a wound in the right nipple produced death so soon, or at all. It is true the witness, Andrew Chase, says, that Amos died of the wound, but that could only have been the conjecture of his uneducated mind, for he tells us that he only saw the outside of the wound and did not probe it ; that it was about a half inch long and near the right nipple. And, as to the location and description of the wound, both witnesses agree. It is much more likely that the sudden excitement and anger caused his death by heart disease. 2 Beck's Med. Jur. (6th ed.) 42, *et seq.*

*J. S. Morris*, Attorney-General.

The jury would have been justified by the evidence in finding the accused guilty of murder, but they convicted him of manslaughter, and the court sentenced him to twelve years confinement in the penitentiary. The errors assigned relate to questions of practice, questions of law and questions of fact. Those of law and practice are based chiefly upon the learned counsel's idea of common law, and are not applicable to trials under our statute. No objections to a grand jury are available after they are sworn. Code of 1871, § 2843, and all the laws in relation to juries are merely directory.

The instructions given show, on the whole, that the jury were properly instructed, and the entire record shows that the prisoner had a fair trial, and that he was properly convicted. And though he might more properly have been convicted of murder, yet, as the jury are the sole judges of the facts, this court will not disturb the verdict.

TARBELL, J. :

The plaintiff in error was indicted at the November term, 1867, of the Issaquena county circuit court, for the murder of Amos Estelin.   He was tried and convicted of manslaughter at the July term, 1871, and sentenced to confinement in the penitentiary for twelve years, from July 18, 1871.   The case having been brought to this court, numerous errors are assigned, as follows :   1st. Disposing of pleas in abatement without replications ; 2d. In disposing of said pleas without trial by jury ; 3d. Overruling the said pleas and holding the accused to answer ; 4th. Overruling the objection of accused to the reading of the indictment and to the trial of accused thereon ; 5th. In suspending the examination of a juror on the special *venire* in the midst of such examination, allowing other jurors to be examined during his suspension ; and then concluding the examination of such juror ; 6th, 7th, 8th.  Giving the first, second and third instructions for the state ; 9th, 10th. In refusing and modifying the first and second instructions asked for the accused ; 11th.  Refusing to permit the defendant to introduce testimony to show the character of the deceased for peace or violence.   12th.  Overruling the motion for a new trial.   With reference to the first alleged error, the record recites that the defendant " filed his said two pleas in abatement upon which the district attorney joined issue, and the court tried the issues on the said pleas in abatement."   If, in fact, there was no replication to the pleas in abatement, the record fails to show that attention was called to the omission, or that any point was made thereon in the court below.   The objection is heard here for the first time, and there being nothing in the record to contradict the foregoing extract therefrom, it may be fairly presumed that the record truthfully asserts, that the " district attorney joined issue " upon the " said pleas in abatement."

To the trial of the issues joined upon the pleas in abatement, by the court, without a jury, no objection was made at the time, the course taken having been pursued without a

question of its propriety or legality, without a request for a jury and without even inviting attention thereto. In the case at bar, the defendant had waived all cause of abatement prior thereto by his plea of not guilty (8 Smedes & Marsh. 587), but he was permitted to withdraw the latter plea and to file his pleas in abatement, a favor resting in the discretion of the court. After a plea in bar it is too late to introduce a plea in abatement, except upon leave of the court to withdraw the one and substitute the other. Bish. Cr. Pr., § 440, and cases. We note this point as indicating an indulgence on the part of the court as well as for other puposes. In Smith v. the State, 28 Miss. 728, the defendant in the court below pleaded in abatement to the indictment, that the grand jury were not sworn according to law. Issue was taken on the plea, and it was tried by a jury. On error this issue was declared an immaterial one, and the whole proceeding "absurd." The court say, "the record which shows the impaneling of the grand jury is the only evidence which can be introduced to prove or disprove this fact ; and whether the proper oath was in fact administered or not, or administered in the proper manner, can never be made the subject of a plea in abatement, but must be ascertained by an inspection of the record, which, in this instance, shows that the grand jury were sworn according to law. The plea, therefore, presented an immaterial issue, and should have been disregarded by the court. After the jury returned their verdict, the defendant moved for leave to file the plea of not guilty, which was refused by the court, and a final judgment was accordingly entered against the defendant. If the plea in abatement had presented a material issue, this action of the court would have been right. But as the plea was a nullity, and as the issue formed upon it could settle nothing, the application of the defendant to plead should have been treated as though there had been no other pleading in the cause." Whether the indictment in the case cited was for a misdemeanor or a felony does not appear. As to the rule on finding an issue

upon a plea in abatement against the defendant, in cases of felony or misdemeanor respectively, see 1 Bish. Cr. Pr., §§ 438, 439, and cases cited.

With regard to the various methods of presenting objections to the organization of the grand jury and its proceedings, see 1 Bish. Cr. Pr., §§ 742–754. It would seem that when the matter set forth in a plea of abatement is determinable by an inspection of the record, a jury is not proper. Ib., §§ 121–130 ; ib., §§ 416–418, note 3 to § 477, and cases therein cited ; ib., §§ 748–750, 480, note 7 to § 750, and cases therein cited ; ib., § 754. For the record is before the court, and the court and not the jury is the judge of it. 28 Miss. 728 ; 11 Humph. 222 ; 9 Ala. 9 ; 12 Tex. 283 ; 28 Miss. 687. In Stokes & Johnson v. the State, 24 Miss. 621, facts *de hors* the record were necessary to be found, and there was a jury on the plea in abatement therein, and the same was the case in 8 Smedes & Marsh. 599. In 23 Miss. 244, a demurrer to this plea was sustained, and the defendant was allowed to plead generally. The pleas in the case at bar present no issue of fact outside the record, although in form and other characteristics pleas in abatement, they submit, in substance and effect, only the sufficiency of the record, requiring merely its inspection and construction, without the aid of extrinsic facts. The court did not err, therefore, in not submitting the issue made by the pleas in abatement to a jury. Upon overruling the pleas, the court did right, also, in holding the accused to answer, as, in case of finding for the defendant, it would have been the duty of the court to have held the accused in custody to await the action of another grand jury. There is no error in this branch of the case.

The fourth and fifth assignments are designed to dispute the sufficiency of the record as to the legality of the grand jury, and the presentment of the indictment as required by the Code. These objections were taken by plea in abatement before trial, and upon the trial by an objection to a trial upon the indictment, as one not found by a legal

grand jury, and not duly presented in court. This part of the record is as follows: "And of the persons so summoned, the following named persons appeared in answer to their names, to wit, John Wheeler and fourteen others, and thereupon the following named persons, after being examined in open court, on oath, touching their qualifications as grand jurors, to the present term, and being found to be competent and suitable persons, over the age of twenty-one and under the age of sixty years, citizens of the United States, and householders and freeholders of the county of Issaquena, were selected to serve as grand jurors at this term of this court, and appeared in answer to their names, and were elected, impaneled and sworn according to law to serve as such grand jurors, whereupon the court appointed Theodore Fitler foreman of said grand jury, who appeared in the presence of the other grand jurors and took the oath prescribed by the statute as foreman of said grand jury, and the other grand jurors, in the presence of their foreman and in the presence of each other, in open court, and took the oath prescribed by law as such grand jurors. * * * And on Wednesday, 27th November, 1867, a day in the same term of the court aforesaid, the following proceedings were had in said court and entered on the minutes thereof, to wit: On this day the grand jury returned into court several indictments, indorsed, 'a true bill; Theodore Fitler, foreman of the grand jury,' which were received, and ordered by the court to be marked 'filed' by the clerk, which was this day done. * * * And the following indictment was filed in said cause, to wit:" following which is the indictment in the case at bar, indorsed, "a true bill, Theodore Fitler, foreman of the grand jury," and also the words, "Filed, November 27, 1867, Frederick W. Anderson, clerk."

The record states the arrest of the accused upon a bench warrant issued on this indictment, his arraignment, and plea of not guilty thereto. Subsequently, leave was given

defendant to withdraw this plea of not guilty, and file the pleas in abatement referred to elsewhere.

" After the grand jurors shall have been examined, elected, sworn and impaneled, no objection shall be raised, by plea or otherwise, to the grand jury ; but the impaneling of the grand jury shall be conclusive evidence of its competency and qualifications ;" except, " that any party interested may challenge or except to the array for fraud." No other objection to the grand jury, subsequent to its impanelment, is now available. Code of 1857, art. 131, p. 499 ; 44 Miss. 789.

When it is set forth in a record that the grand jurors were duly sworn, it will be presumed the legal oath, prescribed by the statute, was administered. Dyson v. the State, 26 Miss. 364 ; Windham v. Williams, 27 ib. 314. In the case at bar, a "grand jury" was impaneled under the supervision of the court, and the presumption is not an unreasonable one, that a legal grand jury was organized according to the requirements of the law. Art. 131, Code, 1857, p. 499. It was held in Easterling v. the State, 35 Miss. 210, that, unless it appear affirmatively to the contrary from the record, it will be presumed that the grand jury was duly and legally organized, and composed of the legal number of competent persons. In Cotton v. the State, 34 Miss. 504, it was declared, that if a grand juror be excused from serving, it will be presumed to have been legally done, the record not showing the contrary. And, a person indorsing an indictment as foreman of the grand jury, will be presumed to have been legally appointed as such. Esterling v. the State, *supra*. If a record recites that " a jury " passed upon a case, it will be construed to mean a legal jury of twelve men, duly qualified. 4 Smedes & Marsh. 579. And, it will be presumed that the grand jury was charged, unless the contrary is shown. 8 ib. 587. The record before us, though not as explicit as it ought to be, substantially states the organization of a legal grand jury, and the due presentment, in open court, by such a grand jury, of the indictment upon

which the accused was arraigned and tried.    We regard
this record sufficient within the cases of 4 Smedes & Marsh.
520 ; 28 Miss. 687 ; 44 ib. 789 ; ib. 731 ; 35 ib. 17, 210 ; 26
ib. 174 ; 31 ib. 421, 490, 504 ; 43 ib. 472 ; 30 ib. 408 ; and
Am. Cr. Law (6th ed.), § 500 ; *vide,* also, Code of 1857, p.
499, art. 131, and p. 614, art. 257.

Having reached the conclusion, that this record may be
sustained without violence to the adjudications, we have to
say of it, as of too many, that it contains much wholly irrel-
evant matter, and a redundancy of verbiage surrounding
but not touching the real points to be stated.    Our Code is
simple, readily understood, easily followed by a man of
ordinary understanding.    The Code states plainly the num-
ber and qualifications of grand jurors, and it is equally
precise in prescribing the mode of presenting an indictment
in court.    These requirements can be repeated in a few lines,
but in most records many pages are given to a verbose nar-
rative of the organization of the grand jury, and the pre-
sentment of the indictment, and yet not a single positive
statement is made in the language of the Code, so that legal
presumptions are necessary to sustain the action of the
court below.    We conclude that these faulty records are
the result of ignorance or indolence.    The state furnishes
the Code to every clerk ; if examined, certainly, an evil in
many cases inexcusable and intolerable, would be corrected.

During the impaneling of the jury for the trial of the
accused, after a juror had been partially examined, without
being challenged by either party, he was directed by the
court to stand aside to await the examination of further
jurors.    At a late hour, this juror was again called, when
he was peremptorily challenged by the district attorney,
and this action of the court is presented by bill of excep-
tions, and is the basis of the fifth assignment of error.    We
do not see that any injustice to the accused, or prejudice to
his case followed this action, nor that it is, *per se,* erroneous.
Under very special circumstances, the accused having ex-
hausted his challenges, a slight advantage in the selection

of a jury might be obtained by the district attorney, but it is not shown that such was the result in this instance. On the contrary, the court temporarily rejected the juror, without compelling either party to challenge, as he had a right to do (30 Miss. 627), and he was recalled only to be peremptorily rejected by the state. In matters of this character, very much is necessarily left to the discretion of the court. We see no error in this respect. See, also, 37 Miss. 369 ; 32 ib. 390 ; 28 ib. 227.

The sixth, seventh, eighth, ninth and tenth allegations of error complain of the first, second and third instructions for the state as erroneous, and claim that the court erred in refusing the first and second instructions asked for the accused, and in modifying the same. These assignments present, substantially, the whole series of instructions on both sides, four for the state and four for the defendant. The following were given for the state :

1. No mere words, no matter how provoking, will justify the killing of a human being, and if the jury believe from the evidence that the accused, intentionally and not in the sudden heat of passion, gave the fatal blow to Amos Estelin that caused his death, and, at the time of killing the deceased by the accused, he was in no immediate danger of loss of life or limbs, then the killing would be murder, and the jury will so find.

2. If the jury believe from the evidence that Sam. Chase entered into the fight with the deceased Amos Estelin armed with a deadly weapon, intending to use the same if necessary to overcome his adversary, then the killing of the deceased by the accused would be murder.

3. If the jury believe from the evidence that the accused killed the deceased without malice, but from a sudden passion, then the crime would be manslaughter and not murder, and they will so find.

4. When the killing of a human being with a deadly weapon is proven, the law presumes malice, and it is in-

cumbent on the accused to show justification or excuse, unless they arise out of the evidence adduced against him.

The following are the instructions for defendant, the words in brackets indicating the additions and modifications made by the court to which the accused objects:

1. If the jury believe from the evidence that the defendant killed the deceased when there was reasonable ground to apprehend a design on the part of the deceased to do some great personal injury to the defendant [by the use of a deadly weapon, not mere blows given with the fist or foot], and there was at the time imminent danger of such design being accomplished [by the use of some weapon likely to produce such injury], the jury will find the defendant not guilty.

2. If the jury believe from the evidence that the defendant killed the deceased in the heat of passion, without malice, by the use of a dangerous weapon, without authority of law and not in necessary self-defense, they will find the defendant guilty of manslaughter; but if they believe from the evidence that such killing was in necessary self-defense, they will find the defendant not guilty. [But to constitute self-defense the assault must have been with some deadly weapon or weapon likely to cause loss of life or limb, and not mere blows given with the fist or foot.]

3. If the jury believe from the evidence that, at the time the killing occurred, the defendant had his knife in his hand, and the deceased made an assault on the defendant, and the defendant threw up his hand containing the knife with a view to ward off a blow aimed at him by the deceased [and with no intention to strike deceased with the knife], and that in thus warding off the blow the death wound was given, they will find the defendant not guilty.

4. The jury will give the defendant the benefit of all reasonable doubts arising from the evidence in the case.

The testimony is brief and may be properly given in connection with the instructions. Andrew Chase, father of accused, testified that witness, deceased and accused all

lived in the same quarters ; deceased complained to witness that accused was running after his wife ; witness, deceased, his wife and Malinda Henderson were on the gallery at the house of deceased ; the latter called to accused, who was passing, to come and listen to the lies deceased's wife was telling on him ; accused came to the gallery, put one foot on the gallery, about eighteen inches from the ground, standing with the other foot on the ground, and placed his elbow on his elevated knee, and picked his teeth with what proved to be a knife ; accused said if Laura said he was running after her she was a liar, and that if deceased said so he was a liar. Deceased then said, " if you call me a liar again I will strike you," and then, without waiting for Sam to reply, Amos ran up to Sam and hit him with his fist and kicked him in the stomach with his foot. Just when Amos struck Sam with his hand and foot, Sam threw up both of his hands and Amos immediately stepped back and said to Laura, " I am stabbed with a knife, get me a rag to stop the blood." Witness asked Sam if it was possible he had cut Amos with a knife, and he said, " I never did it. I threw up my hands to knock his lick and he ran against the knife himself." Witness said, " tut, tut, I will never carry such a silly tale as that is into court." Witness then looked at Amos' wound. It was scarcely a half inch long. It was near the right nipple. When witness saw it he said it was in the wrong place for him to live. Amos died in about fifteen minutes of that wound. The killing was after dark. Sam was about eighteen years of age. Amos was a grown man and more powerful than Sam. The wound was not probed. Accused did not appear to draw back and strike, but to throw up his hands as if to ward off Amos' blow.

Malinda Henderson testified, that " there was a little scuffle and Amos stepped back and told Laura he was cut. When Amos struck, Sam threw up both hands. He did not draw his hand back and strike that I saw. It seemed to me more like he was trying to knock off Amos' lick. He did not

put his hand in his pocket and draw his knife." Witness was at a dance when Laura complained to Amos that Sam was after her.

This was all the evidence in the case, and being thus brief, the issues for the jury were easily made up. The propositions for the jury arising out of the evidence, were: 1st. Was the homicide justifiable on the ground that it was "committed in the lawful defense" of the person of the accused upon a reasonable apprehension of a design on the part of the deceased "to commit a felony, or to do some great personal injury," and of "imminent danger of such design being accomplished?" Code of 1857, art. 168, p. 600. 2d. Was the homicide committed "by accident and misfortune, in the heat of passion, upon sudden and sufficient provocation, or upon sudden combat, without any undue advantage being taken, and without any dangerous weapon being used, and not done in a cruel or unusual manner," and thereupon excusable? Art. 169, p. 601. 3d. Was the killing of deceased done "in the heat of passion, without malice by the use of a dangerous weapon, without authority of law, and not in necessary self-defense?" Ib. art. 174, p. 602. Or 4th, as a matter of fact, was the fatal wound accidental and unintentional, in the act of warding off the assault of the deceased? To the first, second and third of these propositions the jury answered in the negative, but to the third they responded in the affirmative. In such case the accused was guilty of manslaughter, and the jury so found.

Did the instructions as given and modified by the court fairly and impartially present to the mind of the jury the legal questions involved in the evidence? The instructions are, perhaps, open to verbal criticism, but nothing more. The verdict shows, that, even if the court leaned against the prisoner, which is not perceptible, the jury was not impressed thereby.

It was proper for the court to modify the charges asked for the defendant by instructing the jury as to the import of the terms "great personal injury" used in the statute,

(Code, p. 601, art. 168) and in the instructions asked. "The expression of itself is very uncertain and indefinite, and, unless explained and interpreted by reference to the legal principles appertaining to the subject, it is not easy to ascertain what construction might be placed upon the terms of the jury.    *    *    *    The term 'great personal injury' must be understood to be equivalent in import to the terms 'great bodily harm,' or "danger of loss of life or limb,' or 'enormous bodily harm,' as defined by the rules of the common law." Green v. the State, 28 Miss. 687, wherein modifications of charges occurred in language almost identical with that of the modifications in the case at bar.

If the third instruction for the state omitted an important qualification, the omission was fully supplied by the instructions for the defendant. Art. 174, Code of 1857, p. 602.

It is quite true a party may be dangerously and even fatally injured by the fists and feet of another, yet the text-writers and adjudications proceed upon the theory, that an assault with an intent to commit a felony is made with a deadly weapon. In the case at bar, the facts and the verdict of the jury concur in the conclusion, that the deceased did not intend to commit a felony upon, or do great bodily injury, in the legal sense of the term, to the accused. And upon this branch of the case we need not comment further, with reference to the very strenuous argument of counsel.

The eleventh error assigned presents for review the refusal of the court to permit the accused to prove the character of deceased for peace or violence. The question involved is not only one of practical importance, but is, upon examination, one of absorbing interest. In 4 Harr. 562, the court say, "We cannot find any case in the books, where this evidence has been admitted, nor any principle which would admit it.    *    *    *    The question is, guilty or not guilty of murder. The homicide being made out, it lies on the defendant to reduce the offense below the grade of murder, and he must do this by evidence of facts, and not by the

mere general bad character of the deceased." The rule
stated in 8 Ired. 344, is this : "On a trial for murder, evi-
dence of the general character and habits of the deceased,
as to temper and violence, cannot be received. The only
exception to this rule, if there be one is, where the whole
evidence as to the homicide is circumstantial." "Temper
and deportment," say the court, in that case, "if they are
evidence at all, are to be established by facts, and not by
reputation." The court further say : "It is possible,
when the case is one of circumstantial evidence, and there
is no direct proof of the quarrel and combat, that evidence
of the character of the deceased might be mercifully left to
the jury in aid of their inquiries into the origin and pro-
gress of the conflict, in which the prisoner took the other's
life. It was allowed, and on that principle, in Tackett's
case, 1 Hawks, 211. That is the only instance in which,
even in a case of circumstantial evidence, such proof was
held to be proper, as far as our researches and those of the
bar have discovered." Of Tackett's case the court say :
"We cannot act on it as an authority in this case. It does
not profess to be founded on any precedent, and the reason-
ing of the court confines its application to the case of pre-
sumptive evidence before it, in which there was not any
direct proof of the immediate provocation or circumstances
under which the homicide was committed."

It is stated in Wharton's Am. Law of Homicide, 249,
that, "as a general principle, the rule continues unbroken,
that evidence that the deceased was riotous, quarrelsome
and savage, is inadmissible, even though such knowl-
edge be brought home to the defendant himself." 3 Stew.
& Per. 315 ; 1 Hawks, 210 ; 17 Ala. 587 ; 9 Yerg. 342 ; 5
ib. 459 ; 14 Me. 248 ; 3 Ired. 424 ; 8 ib. 344 ; 9 Metc. 110 ; 4
Harr. 562. This qualification, however, is given in Wharton,
to wit : "There have been cases in which courts have been
obliged to allow such evidence to be introduced, and it is
easy to imagine cases in the future in which it would be
impossible to exclude it." Mr. Justice Fisher, delivering

the opinion of the court, in the case of Cotton v. the State, 31 Miss. 504, though the point was not raised by counsel, expresses the opinion, in response to a question propounded by himself, "was there imminent danger to the life or to the person of the party threatened ?" that, "as part of the means of arriving at the truth of this fact, the peculiar character of the hostile party is as much a fact for the consideration of the jury as any other fact in issue, and the jury must determine, from the hostile demonstrations, whether there was such danger of this party's executing his felonious design, as to justify the party killing ; in doing so, although there may have been no actual danger from the deceased at that very moment of time, the question in such case is, whether by the delay the danger is not increased ;" and without reference to any authorities, proceeds at some length to illustrate and enforce his views, saying of a supposed case, that though an" extreme" one, yet, that " it nevertheless serves the purpose for which it is intended, of showing the impropriety of laying down a rule, within the operation of which the court declares a person, without regard to the peculiar circumstances of the case, must bring his defense in order to be successful. Whether the danger must be immediate or unavoidable at the time of killing to justify the party in the act, must depend upon the facts and circumstances." Of these facts and circumstances, as we understand the learned judge, the character of the deceased for peace or violence is a fact for the consideration of the jury.

Another adjudication, wherein evidence of the character of the deceased has been admitted in criminal trials, is that of Monroe v. the State, 5 Ga. 85. In that case the deceased was a desperate, drunken bully, who had killed several antagonists, was notorious for taking an undue advantage of his victims, and, on the occasion of his death, appeared with a gun in his hands for the declared purpose of shooting the defendant in the indictment. There was between them a quarrel of long standing, or rather a series of hostile acts

and threats on the part of the deceased, and his character was as inseparable from the case as his death.    In Wharton's Am. Law of Hom. 227, a case in the eleventh judicial district of Pennsylvania, Judge Conyngham, a very intelligent and able judge, presiding, is referred to at length, in which the killing being admitted, the defendant contended that the act had been done to save his own life from a furious attack of the deceased.    Otherwise than the admission, the proof of killing was circumstantial.    For the purpose of aiding in the discovery of the character of the homicide, the court permitted the defendant to prove the general character of the deceased, as a quarrelsome, fighting, vindictive and brutal man of great physical strength.    It had already been given in evidence that, on the day previous to the killing, the parties had a violent contest, and that the defendant was then saved from very considerable injury, and perhaps death, only by the intervention of a third person. Other cases might be cited where this evidence has been admitted, but they would only serve to confirm the general rule of its inadmissibility, yet, that it is admissible in exceptional and special cases.    When proper, it is unnecessary to decide.    It is sufficient that in the case at bar, the facts did not justify an application of the exceptional rule, and the court was therefore right in rejecting the proffered proof, for which no foundation was laid.    The assault upon the accused did not justify or excuse him (in the legal sense of the term) in taking life.    Homicide is justifiable in defense of one's person or property only, when the intent of the person killed was to commit a felony, for no intent to commit a trespass only will justify a killing.    4 Mass. 399 ; 2 Wash. C. C. 515.    The jury, properly upon the facts, found against an intent to commit a felony.

As to evidence of the character of the accused for peace or violence, the court in McDaniel v. the State, 8 Smedes & Marsh. 401, say, "this evidence of good character in relation to the crime charged, seems to be only admissible in cases where the guilt of the party accused is doubtful." 1 Greenl.

Ev. 65 ; 2 Starkie's Ev. 214 ; Roscoe, 89.   Upon this subject
Starkie says, "juries are called upon to raise an inference
in favor of a defendant in a criminal case, from the grounds
of his character in society ; a presumption too remote to
weigh against evidence which is in itself satisfactory, and
which ought never to have any weight except in a doubtful
case."   It is a general rule, that good character avails a
defendant only in a doubtful case.   A forcible writer has
described evidence of character of the defendant in a crim-
inal prosecution as "the last remnant of compurgation."
The character of the killed may be said to be one degree
removed from that of the accused, yet the latter has been
allowed the benefit of the bad character of the former in
doubtful cases, and dependent upon circumstantial proof,
as we have already seen.   So, too, character of the deceased
has been allowed as in 5 Ga. 85, *supra,* where it was insep-
arable from the homicide, or a part of the *res gestae.*   37
Miss. 327.   But the case at bar is not within the precedents,
either upon the facts, the philosophy of evidence or the
reason of the case.   The general rule is without question,
and it is equally certain that in some cases, evidence of the
character of the deceased has been admitted.   In Jolly v. the
State, 13 Smedes. & Marsh. 223, and in Wesley v. the State,
37 Miss. 327, the doctrine herein indicated is distinctly
recognized.

The propriety of admitting evidence of the character of
the deceased in the case at bar is urged in three aspects :
1st. To show the character of the assault made upon the
deceased by the accused ;   2d. As essential in the consider-
ation of the question whether the deceased died of the
wound, or of heart disease ;   3d. That upon the evidence, it
is doubtful whether a case was made out against the ac-
cused, and the verdict is, therefore, contrary to the evidence.

The second point does not appear to have been discussed,
or adjudicated on the trial, and the third only as growing
out of the first.   The case made by the record is not one of
doubt or of circumstantial evidence.   The killing was in

the presence of witnesses, who heard and saw the beginning and the ending of the first and only difficulty between the parties. Prior quarrels or threats by the deceased against the accused are not pretended. No proof appears to have been offered that the deceased was not in good health, or that he was subject to heart disease, or other sudden ailments. There was no *post mortem* or other medical examination, and there was an apparent cause of death. No attempt was made on the trial to disprove the theory that death resulted from the cut. Medical authorities are referred to in vain in this case, in the absence of any surgical test or evidence, or of any attempt to throw doubts upon the cause of death, by showing the deceased subject to a malady, liable to a sudden and fatal termination. 43 Miss. 472. Upon this point we are entirely satisfied with the action of the court below. We may add, that the cases are numerous wherein this evidence has been proposed and rejected; and the rejection sustained on error; while the instances of its admission are extremely few. With this limited development of a question of great practical interest, we append, without further discussion, the authorities upon which the foregoing comments and conclusions are based.

Am. Cr. Law, §§ 1019, 1027, and the very numerous authorities therein cited, particularly note (*x*) to § 1026, ib. and § 641 and notes; Am. Law of Hom. 211, 249, and cases there referred to; Starkie on Ev. 74; Roscoe's Cr. Ev. 94, note 1; 1 Russell on Crimes, 656, *et seq.;* 2 ib. 785, 786; Coxe, 424; 1 Bald. 514; 8 Humph. 118; 9 Barb. 609; 2 Mass. 317; 14 Mo. 502; 8 Smedes & Marsh. 401; 18 Ala. 720; 3 Strob. 517; 19 Ga. 102; 5 Cush. 295; 4 Harr. 562; 8 Ired. 344; 13 Smedes & Marsh. 223; 3 Stew. & Porter, 315; 17 Ala. 587; 9 Yerg. 342; 3 Ired. 424; 9 Metc. 110; 5 Cush. 535; 14 Me. 248; 8 Wright, 386; 2 Kansas, 419; 17 Mo. 544; 2 Gray, 294; 10 La. 453; 10 Cal. 309; 12 La. Ann. 679; 2 Comst. 197; 4 Barb. 460; 16 Ill. 17; 12 Tex. 525; 23 Ill. 17; 46 Barb. 625; 21 ib. 23; 12 Gray, 168; 37 Miss. 327; 17 Ga. 465; 22 Ala. 39; 25 Ga. 699; 33 Ala. 380;

6 Jones (Mo.), 588 ; 1 Metc. (Ky.) 370 ; 12 Rich. (S. C.) 430 ; 2 Heard, 748 ; Am. Cr. L., § 1020; ib. § 1026, note p ; 1 Hill (N. Y.), 420 ; Am. Law of Hom. 216, 217.

The last ground of error assigned brings up the motion for a new trial, and its causes, which was overruled. The points upon which the motion was based and the assignments of error are the same, except that in the former the verdict was alleged to be contrary to the evidence, and the instructions and the misconduct of a juror was charged. The verdict is amply sustained by the testimony. Notwithstanding the instructions for the state, and the modifications of those asked for the accused, complained of as calculated to restrict the jury and influence them against the latter, it is evident they were thus wholly uninfluenced, as it is manifest they took a most liberal and humane view of the case in favor of the prisoner, certainly to the very extent to which they were warranted by the facts before them. Hence, though the instructions may be, in some slight verbal respects, erroneous, and may have given too little latitude to the jury, which is not apparent, no injustice was done the defendant. The facts are few, simple and undisputed upon the trial. An accusation of social misconduct against the accused toward the deceased ; insulting words by the accused ; an assault by the deceased with his fist and foot ; an open knife in the hand of the accused ; a cut in the right nipple of deceased ; a cry that he was stabbed, and for a cloth to stop the blood ; death ; and a verdict of manslaughter, in which the jury were mercifully and intelligently correct.

In regard to the misconduct of a juror, it was, at most, only *prima facie,* and was wholly disproved. There is nothing whatever in it.

Upon the whole, the case was fairly and impartially tried. Neither error, haste or oppression are shown. The indictment was found in 1867. Trial was had in 1871, and the court granted requests not required by law, by way of indul-

gence to the accused, who was aided, as the case shows, by industrious and able counsel.

Seeing no material error to the prejudice of the accused, and the verdict being amply sustained by the evidence, the judgment is affirmed.