Oliver v. The State.

DARGAN, C. J., not sitting.

~~~~~~~~~~~~~~~

## OLIVER *vs.* THE STATE

1. Where it appears that the deceased, from the time the wound was received, fifty-two days before his death, uniformly expressed the belief that the wound was mortal, that his medical attendant had so informed him, and that he was paralyzed from the point at which the ball entered, just below the shoulder, to his feet, a sufficient predicate is laid to authorise the admission of a statement, made three days before his death, as a dying declaration.

2. Such circumstances, connected with the homicide, as the deceased, if living, would b · allowed to testify to, may be the subject matter of dying declarations.

3 The declarations of the accused, made after the commission of the act

with which he stands charged, where they form no part of the *res gestœ*, are not admissible in his favor as original, independent testimony.

4. The intent, with which a child under twelve years of age is forcibly taken from its parent, is a fact to be infered from the evidence, and falls within the exclusive province of the jury.

5. The law will justify the taking of life, when necessary to prevent the commission of a felony, but not to prevent the commission of a mere trespass on the person or property of another.

6. The necessity that will justify the taking of life need not be actual, but the circumstances must be such as to impress the mind of the slayer with the reasonable belief that such necessity is impending.

7. Whether the circumstances are such as to create a reasonable belief in the mind of the slayer that a necessity exists for taking the life of another is a question for the jury, in the solution of which they may consider the condition of both the parties.

8. If an act, amounting to manslaughter, be *voluntarily* committed, the statute, without regard to the circumstances of provocation, fixes the grade of the offence, and pronounces it manslaughter in the first degree.

9. Where a party, without necessity, kills another with a deadly weapon, the law, in the absence of proof to show that it was accidental, will imply that the act was voluntarily done.

Error to the Circuit Court of Talladega. Tried before the Hon. John J. Woodward.

THE plaintiff in error was indicted for the murder of one William E. Hammond. The evidence, so far as it is necessary to a proper understanding of the questions raised by the assignments of error, was substantially this: The accused and the deceased married sisters. During the absence of the deceased from home, Mrs. Oliver, becoming dissatisfied with her husband, left his house and went to that of the deceased, carrying with her her children, then under the age of twelve years. After the deceased returned and on the day before the homicide, the accused requested one Alexander to see the deceased and asked him to meet him at Alexander's house for the purpose of conversing with him in reference to his wife and children, which was done and they met accordingly. On the morning of the homicide, the accused went to the house of Alexander and informed him that the deceased was to bring his wife and children there on that day and that they were to endeavor to settle the matter between him and his wife. About one o'clock on that day the deceased arrived and with him the

wife and children of the accused, and as he rode up he said to the accused, "here they are, I deliver them to you." It appears that Mrs. Oliver was desirous of going with her children to the house of one Raiford, who lived in Marshall county, Mississippi, and that the accused was willing that she should do so, upon being assured that the children would not be removed from there and would be delivered to him when required; and for the purpose of obtaining this assurance, the accused drew up an instrument, which he required Mrs. Oliver to sign and swear to, binding her not to remove the children from the house of Raiford and to deliver them to him whenever he should demand them. Mrs. Oliver was willing to sign the instrument and take the oath, but upon its being read, the deceased remarked that it was too binding and she should not do it—that Raiford was in a moving condition and if he moved Mrs. Oliver would have to go with him. To this the accused replied, that if she did not sign the writing, she should not have the children, and that he would take them himself. The deceased then said, slapping one hand in the other, that he would take them, that he was not afraid, and he thereupon rose from his seat and "took hold of the accused from behind and pushed him along before him out of the passage in which they were sitting, some thirty steps." The deceased was much the stoutest man of the two, but did not strike the accused, nor the accused him. Whilst the deceased and the accused were thus engaged one of the witnesses proposed to part them, when Mrs. Oliver said, "Let them alone, if he kills him." When the witness approached them he discovered that they were struggling for a pistol which was held in front of the person of the accused— each having hold of it. The parties fell, either by the deceased throwing the accused, or by the accused sinking down to elude the grasp of the deceased, and the witness then seized the pistol and took it from them. The deceased being on top asked the accused if he would behave himself, to which he replied at first that he would not, but afterwards that he would, whereupon the deceased got off of him. On rising, the accused drew another pistol and said, "I'll be damned if I havn't another pistol," and he shook it at the deceased, but said further, "I did not bring it for you, nor do I intend to hurt you." The deceased replied, "I have weapons too, and am not afraid," and

drew a knife but made no effort to use it. It also appears that during the scuffle the accused said all he wanted was his children. After the accused had drawn his second pistol, one of the witnesses told him to put it up, and he thereupon dropped it to his side and walked towards the house, where his wife and children were, and the deceased and the witnesses followed him in a slow walk. The accused put his hands before him, but what he did was not seen, and on reaching the entrance to the house wheeled and fired at the deceased, inflicting a wound of which he died in fifty-two days thereafter. It was shown by the State by the testimony of the attending physician and another witness, that from the first the deceased had uniformly expressed his belief that the wound was mortal, and that his medical attendant had so informed him, and that he was paralyzed, from the wound, which was just below the right shoulder, to his feet. Upon this predicate, the State offered to prove the following declaration of the deceased, made three days before his death, on its being reported to him, that one of the witnesses, on an examination touching the matter, had sworn, that he, the deceased, at the house of Alexander and immediately after the accused had said, if his wife did not sign the writing he would take the children, had seized the accused whilst the latter was sitting in his chair—"There must be some mistake in this—Oliver was in the act of rising from his chair." To the admissibility of this declaration the counsel of the accused objected, but the court overruled the objection and allowed it to go as evidence to the jury, whereupon the plaintiff in error excepted. The facts upon which the only exception was taken to the ruling of the court in the exclusion of testimony, as well as the charges given and excepted to, are sufficiently set out in the opinion of the court.

RICE, for the plaintiff in error:

1. The right of the father to the custody and services of his infant children (under seven years of age) is deemed sacred both by human and divine law. Neither a dissatisfied mother, nor any third person can deprive a father of this right.—King v. Greenhill, 31 Eng. Com. Law Rep. 153; 19 Wend. Rep. 16-24; 10 Vesey, 52; Roberts v. Connelly, 14 Ala. 239.

2. Every father has the right to defend his person, property

and children against unlawful violence, and may employ as much force as is necessary to *prevent* its invasion.—The State v. Johnson, 12 Ala. 840; Commonwealth v. Kenard, 8 Pick. R. 133; Wharton's Criminal Law, 254-258; State v. Rutherford, 1 Hawks, 457; 4 Black. Com. 181; The State v. Roane, 2 Dev. Law Rep. 58; State v. Craton, 6 Iredell's Rep. 174 to 176; Addis. 248, cited in 1 Wheeler's Cr. Cases, 257. "*Se et sua defendens*" is the expression of law.—1 Russel on Cr. 543, marginal page.

3. The right of defence in such cases, is founded on the law of nature, and is not, nor can be superseded by any law of society.—Wharton's Cr. Law, 254.

4. If a man, though in no danger of serious bodily harm, through fear, alarm or cowardice, kill another, under *the impression* that great bodily harm is about to be inflicted on him, it is neither manslaughter nor murder, but self defence—especially where that impression is produced by the *unlawful conduct and violence* of the party killed, or by his being in an apparent situation to do harm.—Grainger v. The State, 5 Yerger, 459; 2 Starkie's Ev. 950; Wharton's Cr. Law, 258; The State v. Rutherford, 1 Hawks, 457; 2 Wheeler's Crim. Cases, 507, (charge of Judge Story;) State v. Scott, 4 Ired. 415; Copeland v. The State, 7 Humph. R. 481. The reason of this rule is that the man acts from an *impulse* which he can *neither resist nor suppress* by the exercise of his reasoning faculties; and Hammond having shown that he had malice against Oliver, was "not fit to be trusted with a dangerous weapon in his hand."— Foster's Cr. Law, 264; Mawgridge's Case, cited 1 East's Crown Law, 276.

5. The forcible taking of a child under twelve years of age, with intent to detain (or conceal) it from its father, is a felony in Alabama. So is the malicious or fraudulent taking of a child, with like intent.—Clay's Dig. 415, § 20; Ib. 439, § 8.

6. The same rules which apply to a personal injury to the father, must apply to an injury to his *relative right* to his children.—Wharton's Criminal Law, 258; 7 Ala. 169.

7. Manslaughter in *the first degree*, under the penal code, is a *voluntary killing*, without malice, but without legal excuse or justification. Every case of manslaughter, as defined by the common law, (whether voluntary or involuntary manslaughter,)

is, under our penal code, manslaughter in the *second degree*, unless it is proved that the slayer "*voluntarily deprived*" the deceased "of *life*." The *will* to take *life*—the *intent* to *kill*— distinguishes manslaughter in *the first* from manslaughter in the *second degree*. The common law classification of manslaughter —voluntary and involuntary—is superseded by our penal code. Clay's Dig. 413, §§ 3, 4; Commonw. v. Gable, 7 Serg. & Rawle, 428-434; Wharton's Crim. Law, 224; Read v. Austin, 9 Missouri R. 727; cases cited from N. Ca. Rep. *infra*. In Pennsylvania, the common law classification of manslaughter into voluntary and involuntary, is *expressly recognised by statute*.—7 Serg. & Rawle, 425. Not so in the penal code of Alabama.

8. The *will* to take *life*—the *intent to kill*, must be proved beyond a reasonable doubt, by the State. If not, it cannot be manslaughter in the first degree.—Coffee v. The State, 3 Yerger, 283; 1 Russel on Crimes, (top pages,) 386-387, notes; 2 Starkie's Ev. 948, note 1.

9. The question of intent, is always a question for the jury. The court never can decide it—even where a *deadly weapon* is used.—Weed v. Evans, 2 Speers (S. C.) Rep. 232; 2 Wheeler's Crim. Cases, 508—per Judge Story.

10. The use of a *deadly weapon* does not authorise a court to pronounce upon the *intent;* because an indignity offered to the person, coupled with a breach of the peace, will extenuate a homicide to manslaughter, although a *deadly weapon* is used. And the question still is for *the jury*, whether it is manslaughter in the *first degree*, or only in the *second degree*.—The State v. Tackett, 1 Hawks Rep. 219; The State v. Yarbrough, 1 ib. 78; The State v. Hill, 4 Dev. & Batt. 491; U. States v. Travers, 2 Wheeler's Cr. Cases, 508—per Judge Story; Rex v. Phillips, 2 Cowper, 830.

11. The first and third charges of the court did infringe the right of trial by jury. They took from the jury the consideration of the question of *intent*. The third charge took from the jury the consideration of the question of manslaughter in the second degree, and cut the prisoner off from the benefit of doubt which might arise as to the *degree* of manslaughter. Such charges must make undue impressions on the minds of the jury, and ought not to be tolerated in grave criminal cases.

12. To render dying declarations admissible, they must be

made under a *sense* of *impending* death—" an almost *immediate dissolution.*"—2 Phil. Ev. 606-7; 1 Greenl. Ev. § 158 ; Montgomery v. The State, 11 Ohio R. 424; McLean v. The State, 16 Ala. 674; 2 Barn. & Cress. 608.

ATTORNEY GENERAL, for the State:

I. The dying declarations of Hammond were made under such a sense of impending death as to render them admissible in evidence.—1 Greenl. Ev. § 158; 1 East P. C. 356; State v. McLean, 16 Ala. 674, and authorities there cited.

II. The conversation of prisoner, after the killing, with Turner and others, and their advice to him was correctly ruled out.— Bradford v. Bush, 10 Ala. 389; State v. McLean, *supra;* State v. Tilly, 3 Ired. R. 424.

III. There was no error in the first charge of the court, that if deceased had taken the children of Oliver under the circumstances, it would have been no felony. The " *intent* to conceal or detain them" was wanting.—Clay's Dig. 415, § 20.

IV. If there is any error in the second charge, it consists in ruling the law more favorably to the prisoner than it really is.

1. A man may kill another to prevent the commission of a known felony, but for offences of a less grade, either to the person or property, an immediate resort to deadly weapons and the killing of the assailant would make it manslaughter, if not murder.

2. Parent and child may kill an assailant in the necessary defence of each other, but the necessity must be urgent, actual and pressing.—1 Hale P. C. 484; 1 East P. C. 273; United States v. Wiltberger, 3 Wash. C. C. Rep. 521.

3. The belief that there is a pressing necessity for the homicide, without reasonable grounds for that belief, will not justify it.—Wharton Cr. Law, 260 ; 1 East 272 ; State v. Scott, 4 Iredell, 415.

4. If the "grounds" for the homicide *had existed* and were not such as to justify the prisoner, certainly his *belief* merely that they did exist, would not justify him in the act.

V. The Circuit Court charged, the least offence of the prisoner under the proof, was manslaughter in the first degree.

1. Many features of the case bear the impress of murder, such as the previous preparation and concealment of deadly

weapons, and the undue advantage taken by the prisoner.—1 Russ. on Cri. 445-447; Wharton Cr. Law, 260; State v. Johnson, 1 Ired. 354.

2. Our statute makes no new decision of manslaughter from that of the common law. It merely designates voluntary manslaughter of the first degree—all other of the second. The killing in this case was, either with a positive intent to kill or to do some great bodily harm, either of which will make the killing voluntary and of the first degree.—Commonw. v. Gable, 7 S. & R. 423; Clay's Dig. 413, §§ 3, 4.

DARGAN, C. J.—Stephen P. Oliver was indicted and tried for the murder of Wm. E. Hammond, in the Circuit Court of Talladega. The jury returned a verdict of guilty of manslaughter in the first degree, upon which the court sentenced him to be imprisoned in the Penitentiary for the term of two years. On the trial several exceptions were taken to the ruling of the court, and the cause is brought here for our revision by a writ of error.

1. The first assignment of error is that the court admitted certain declarations of the deceased, made a few days before his death, to go to the jury as evidence. Dying declarations, made under the sense of impending death, are admissible as evidence, when the death of the deceased is the subject of the charge, and the circumstances of the death are the subject of the declarations.—Greenl. Ev. §§ 156, 158. It is essential to the admissibility of such declarations as evidence, that they were made under the sense of impending death. It is this condition of the declarant's mind that gives to them a sanction equivalent to an oath, for it is supposed that when one stands on the verge of time, and the hopes of life and this world are gone, that the mind is influenced by the most solemn considerations to speak the truth alone. But the condition of the mind of the declarant is first to be ascertained by the judge before the declarations are to be received. In doing this, the court must look to all the circumstances under which they were made, and if they be sufficient to induce the belief that the deceased made them under the sense of impending death, the declarations are admissible. McLean v. The State, 16 Ala. 672, and cases there cited. The declarations in the case before us were made three days before the death of the declarant, but from the time he received the

wound he expressed the uniform belief that he would never re-
cover, and that the wound was mortal. The attending physi-
cian stated that he considered the wound mortal, and had so
told the deceased; and that from the effects of the wound the
deceased was paralysed from where the ball entered, just below
the shoulder, to his feet. We cannot see how a man in this
condition—declaring himself that he cannot live, told by his at-
tending physician that his wound was mortal, and entirely para-
lysed from the effect of the wound—could fail to be impressed
with the sense of impending death.

2. The declarations too had reference to the circumstances
of the death, that is, they refered to a fact in connection with
the charge, to which the deceased would have been competent
to testify, had he been living; and as they relate to a circum-
stance in connection with the homicide, to which the deceased
would have been a competent witness, they were properly re-
ceived as evidence.

3. The prisoner offered to prove that on the day he shot the
deceased, he went to the town of Talladega, with the view of
surrendering himself as a prisoner; that on his way he met with
one Turner, and told him that he had shot Hammond and was
going to give himself up; and that after reaching Talladega he
gave information to the same purport, when he was advised not
to surrender himself until he had procured persons to become
his bail. This testimony was objected to by the State, and the
objection was sustained. It is certainly incompetent as a gen-
eral rule, for a party by his own declarations after the act is
done to make evidence for himself.—McLean v. The State, 16
Ala. 672; Bradford v. Bush. 10 Ala. 389; State v. Tilley, 3
Ired. 424. Such declarations, however, may become evidence
if they form a part of the *res gestæ*, or if they are introduced
against the accused; then all he said must go to the jury, as
well such portions as are favorable as those portions that are
unfavorable to his innocence: Or if the State had first introduced
evidence that the deceased had fled, then it would have been
competent for the accused to have shown the reason of his flight,
as that it was not from a sense of guilt, but from the advice of
others, or from any motive that would negative the idea that he
fled to avoid the consequences of his crime. But the State in
this case did not bring out the declarations; they are no part of

the *res gestæ*, nor does the record contain any evidence to show that the State proved or offered to prove that the accused fled from justice. His declarations, therefore, after the act done, can in no point of view become evidence in his favor. It is true that one witness stated that he arrested Oliver, and that he saw the deceased every day after the wound was inflicted, except for a few days, when the arrest was made; but we cannot infer from this that there was evidence before the jury of the flight of the prisoner; we can make no intendment in favor of the party excepting. If there was evidence tending to show that he had fled, or had in any manner avoided an arrest, it should have been shown by the bill of exceptions. As this was not done, the declarations of the prisoner could not be received as evidence, and were properly excluded.

Upon the testimony that was introduced the court charged the jury—1st. That if Hammond had taken the children of Oliver under the circumstances, he would not have been guilty of a felony. 2d. That if there was an apparent necessity for Oliver's killing Hammond in order to get possession of his children, he then was justified in killing him; but unless Oliver had reasonable grounds to believe that the necessity was apparent and pressing, that it did not justify Oliver's killing him, although Oliver might believe it did exist. 3d. That if Oliver shot Hammond as stated, without reasonable ground to believe there was a necessity to kill him in order to prevent his taking his children from him, then the homicide could not be less than manslaughter in the first degree.

The 20th section of the 3d chapter of the penal code enacts, that " every person who shall maliciously, forcibly or fraudulently lead, take or carry away, or decoy or entice away any child under the age of twelve years, with the intent to detain or conceal such child from its parent, guardian, or any other person having the lawful charge of such child, shall, upon conviction, be punished by imprisonment in the Penitentiary for a period not less than five years,"—(Clay's Dig. 415,)—and by the 8th section of the 8th chapter, all offences punishable by imprisonment in the Penitentiary are made felonies.—Ib. 439. The court by the first charge undertook to pronounce that the deceased would not have been guilty of a felony had he carried out his threat and taken the children of Oliver from him by force.

That the judge overstepped the law that separates his duty from that of the jury is manifest; for whether Hammond would have been guilty of a felony or not, if he had consummated the threatened act, would have depended on the intent with which it was done. If the intent had not been such as would have rendered the deceased guilty of felony, the act would have amounted to a trespass only, for we cannot imagine that every taking of a child from a father would amount to a felony; as if a grandfather or other relative should induce a child to leave its father's house and go with him, though this should be done without the knowledge of the father, yet if the act was the mere result of affection for the child, or the desire to have its company, and did not spring from a corrupt intent to detain or conceal the child from its parent, it could not amount to a felony. Nor can we think that if the father and mother quarrel, and, being about to separate, they both contend for the possession of their infant children, that a stranger would necessarily be guilty of a felony, if he interfered and protected the possession of the mother, or even took the child from the father and gave it to the mother, for he might not be influenced by the felonious intent of detaining the child from the father. Such conduct, however, without regard to the intent, would be a violation of the rights of the father, for every father is entitled to the possession and control of his child; but whether it would be a trespass or a felony would depend on the intent with which the act was done. To constitute this offence the criminal intent and the act must both concur, and this intention is a fact to be infered from the evidence, and can be ascertained only by the jury. The presumption of one fact from another is a presumption of fact, and unless the law itself draws the inference, the jury alone can do it. In the case of Castello & Keho v. Thompson, 9 Ala. 586, it was said that the court cannot pass upon the effect of testimony, when the question to be determined is whether an act was done with a fraudulent intent. To the same effect is the case of Weed & Fanney v. Evans, 2 Speer, 232; see also 3 Whar. 143; 9 Leigh 678; Lindsay v. Lindsay, 11 Verm. 621.

There are cases, as we shall presently see, where the law will itself imply one fact from the existence of another. This, however, would be a legal presumption. But in reference to the question now under consideration, there was no one

fact proved from which the law would or would not have drawn the inference of a felonious intent, or from which it would have denied the existence of such intention. It was therefore peculiarly the province of the jury to determine the intention that influenced the deceased, for on that would have depended his guilt or innocence: And as the judge undertook to pronounce that the deceased would not have been guilty of a felony, without regard to his intention, or without leaving the question of intention to the jury, he assumed to determine the facts, and consequently erred.

If the second charge was erroneous, the error was favorable to the prisoner. The law, it is true, will justify the taking of life, when it is done from necessity, to prevent the commission of a felony, or to preserve one's own life, or his person from great bodily harm.—4 Black. Com. 184; 1 Russ. on Cr. 513; 1 Hale's P. C. 445. So may one strike to protect his wife, his child, or servant, and if the assailant, who intended the felony, be slain, the law considers it homicide in self-defence. But it is not to be understood that the law will justify the taking of life for the purpose of preventing a mere trespass to property, or an assault upon the person that does not threaten a felony or great bodily harm.—Russ. on Cri. 520; Grainger v. The State, 5 Yerger 459. The law has never justified the shedding of human blood to prevent slight injuries to the person or the property of others. Nor can we suppose that our predecessors ever intended to hold a different rule, or to depart from those principles, which have received the sanction of wisdom and stood the test of time. In the case of Johnson v. The State, 12 Ala. 841, the court merely affirmed the general rule that every one had the right to defend his person and property against the unlawful violence of another; but we apprehend that if the accused had been indicted in that case for an assault, instead of resisting process, he would have been convicted. If, however, it was intended by that decision to hold that life may be taken to prevent a mere trespass to property, we should without hesitation overrule it. To justify the taking of life there must be an imperious necessity to prevent the commission of a felony or great bodily harm. Without this necessity, the law, although under some circumstances it will mitigate the crime to manslaughter, cannot hold the party slaying altogether justified.

The charge, however, justifies the accused in taking life, without regard to the fact whether the act was done to prevent a felony or not. We can see no reason why he should complain of it.

But the latter part of the second charge informed the jury that unless the prisoner had reasonable ground to believe that the necessity was pressing, then he was not justified. It is true that the necessity which exculpates the accused from guilt need not be actual. If the circumstances be such as to induce a reasonable belief that such necessity exists, the law will acquit the slayer of all guilt; but if there is no reasonable ground for believing that there is such a necessity, then the law cannot acquit him.—Wharton's Crim. Law, 210; 1 East. 272; State v. Scott, 4 Ired. 415. It has been said that if a man kill another through fear, alarm or cowardice, under the belief that great bodily injury was intended him, it is neither murder nor manslaughter, although at the time of the killing he was in no danger of injury. 5 Yerg. 459. We think it wholly immaterial to inquire, in laying down the principle of law, whether the party slaying was in a state of fear or alarm—whether he was a man of firmness of character or of a weak or cowardly disposition. The question is whether the circumstances were such as to produce a reasonable belief upon his mind of a pressing necessity to take the life of the assailant. If they were not, he cannot be justified by law. It may be said that the belief of imminent danger will exist in the minds of some from circumstances that would produce no idea or belief of danger in the mind of another. This, however, will not alter the principle of law applicable to both. The law requires that the circumstances should be such as to create a reasonable belief of impending necessity. These circumstances are to be ascertained by the jury, and they may consider the condition as well of the party killing as that of the party slain; and if they find the circumstances such as to create a reasonable belief in the mind of the accused that his danger was imminent, then the law would say that he might strike in his own defence. In no point of view has the prisoner been injured by this charge.

The counsel for the prisoner contends that the third instruction is erroneous for two reasons; first, that it precluded the jury from considering, whether the accused was not guilty of

manslaughter in the second degree, and secondly, that the Judge invaded the province of the jury, and determined that the act was voluntarily done, when the jury alone were authorised to ascertain whether the prisoner intended to take life or not. Manslaughter by our penal code is divided into two grades, the first and second degree. The first degree consists in voluntarily depriving a human being of life, under circumstances, that would make the act manslaughter at common law. The language of the code is, " Every person convicted of the crime of manslaughter by voluntarily depriving a human being of life, shall be guilty of manslaughter in the first degree, and on conviction shall be punished by imprisonment in the penitentiary for a period, not less than two, nor exceeding ten years." The next section provides, that every person convicted of manslaughter, under any other circumstances than those expressed in the last section, shall be deemed guilty of manslaughter in the second degree, and shall be fined in a sum, not exceeding one thousand dollars, and imprisoned, not exceeding six months, or both fined and imprisoned.—Clay's Digest, 413. It is contended that involuntary manslaughter, as known at common law, in some instances may, or ought to be punished with more severity than voluntary manslaughter, committed under peculiar circumstances of high provocation, and therefore that it was not the intention of the Legislature to declare all cases of voluntary manslaughter, manslaughter in the first degree, and all cases of involuntary manslaughter, as known at the common law, manslaughter in the second degree; consequently, that the jury alone can determine the degree of the guilt, even if the act amounted to manslaughter, and was voluntarily done, and that they would have the legal right to find an act of voluntary manslaughter, manslaughter in the second degree. We cannot look to the punishment prescribed by the statute to ascertain the degree of the crime, for that is not the test that the law prescribes to ascertain it. When the act is wilfully or voluntarily done, without regard to the circumstances of provocation, the law declares it manslaughter in the first degree. It is the will, concurring with or directing the act, that fixes the grade of the crime, and to this test alone can we look to ascertain it. The only question therefore is whether the killing was committed under such circumstances, that the law itself would draw the inference

that it was voluntarily done? If so, the court did not err in telling the jury, that if Oliver shot Hammond as stated, without reasonable grounds to believe that there was a necessity for it in order to prevent his taking his children from him, then the homicide could not be less than manslaughter in the first degree. All the witnesses concurred in the fact, that the prisoner shot the deceased; on this point there was not the slightest conflict of proof, nor was there an effort made to show that the shooting was accidental. The legal effect of the charge therefore is, that if the prisoner shot the deceased without necessity, he did it voluntarily. We have seen that the intention, with which an act is done, is a question of fact, which the jury alone can draw, unless the law itself will imply the intent, from some act that is ascertained. The law in some instances, however, will imply malice, which cannot exist without the will; for instance, if the facts be, that one broke and entered the house of another in the night and killed him whilst asleep, this would be murder, if these facts alone were found by a special verdict. Here the law would not only imply the will to do the act, but also the malice with which it was done. In the case of the Commonwealth v. Drew, 4 Mass. 391, it was said if the act producing death be such as is ordinarily attended by the use of dangerous weapons, such as fire arms, malice will be presumed by law, unless there is shown some sufficient excuse or provocation, for the law infers that the party intended the natural or probable effects of the act. So in the case of The U. States v. Travers, 2 Wheeler's Crim. Cases, 508—Judge Story said, that in cases of this sort, much depends on the weapon; if it be one that immediately endangers life, as a loaded gun, the party will be guilty of murder. In the case of The State v. Lipsy, 3 Dev. 485, it is said, that malice will be presumed from the nature of the instrument and the want of provocation. In Hill's Case, 2 Gratt. 594, it was held that a mortal wound, given with a deadly weapon upon a slight or no provocation, is *prima facie* willful and premeditated. In these and many other cases that might be cited, the law itself draws the inference of a malicious intent from the act, and we feel constrained to hold, that if one without necessity kills another by the use of a deadly weapon, the law will infer that he designed to do or accomplish what would be the probable or natural consequences

of his act. Therefore the law will imply, in the absence of proof to the contrary, that one who slays another with a deadly weapon did it voluntarily, and, being voluntarily done, it could not in legal contemplation be manslaughter in the second degree, but if the act amounted to a crime at all, it must be manslaughter in the first degree, or a higher offence. True if there was any evidence from which it might the infered that the shooting was accidental, then the question of intent or will would necessarily be a question for the jury, and the court could not instruct them that the will to do the act did or did not exist, but when there is no question about the fact whether the shooting was accidental or designedly done, from the very nature of the weapon the law will imply that it was voluntary,—that the party intended what was the probable or natural consequences of his act. The charge of the court, that if the accused shot the deceased under the circumstances as deposed to by the witnesses, without any necessity, the crime could not amount to less than manslaughter in the first degree, does not violate any principle of law, and consequently cannot be said to be erroneous.

The cause, however, must be reversed and remanded for another trial, for the error we have before pointed out.