# Storey *v.* The State.

## *Indictment for Murder.*

1. *Indictment for murder; verdict not specifying degree of homicide will not support conviction.*—Under an indictment for murder, a general ver-

[Storey v. The State.]

dict of guilty, which does not find the degree of the homicide, will not support a judgment of conviction.

2. *Oath to jury; when insufficient.*—The settled rule is that where the judgment-entry in a criminal case purports to set out the full oath administered to the jury trying the cause, it must express every essential element or ingredient of the oath, as prescribed by statute (Code of 1876, § 4765); and hence, a recital in such judgment-entry that the jury were "sworn and charged well and truly to try the issue joined," omitting the words, "and a true verdict render according to the evidence; so help you God," is fatally defective.

3. *Same; when sufficient.*—But a recital in the judgment-entry that the "jury were duly sworn," or "were sworn according to law," is sufficient; and "it is the safer practice for the *nisi prius* courts to pursue."

4. *Credibility of witness; when charge in reference to free from error.* It is error for the court to refuse a charge requested by a defendant in a criminal case, there being a conflict in the evidence, instructing the jury, that "if there is a conflict in the testimony of the witnesses offered by the State, and those offered by the defendant, the jury must determine which of said witnesses they will believe; and that in determining what weight they will attach to the testimony of any particular witness, they may look to the manner of such witness on the stand, and to his interest and feeling, if any, in the case, and as to whether or not he has been contradicted by other witnesses in the cause, or by his own previous statements."

5. *Law of self-defense; accused must be free from fault.*—It is a fundamental principle of the law of homicide, when the doctrine of self-defense is invoked, that the accused must be free from fault in having provoked or brought on the difficulty in which the killing was perpetrated; if he himself was the aggressor, he can not be heard to urge , in his own justification, the necessity for the killing which was produced by his own wrongful act.

6. *Same; when duty of accused to retreat.*—Another important principle of the law of homicide, governing, at least, cases of mere assault, or of mutual combat, where the attacking party has not "the purpose of murder in his heart," is, that the right of self-defense does not arise until the defendant has availed himself of all proper means in his power to decline the combat by retreat, provided there be opened to him a safe mode of escape.

7. *Same; when accused need not retreat.*—But where the assault is manifestly felonious in its purpose, and forcible in its nature, as in murder, rape, robbery, burglary, and the like, as distinguished from secret felonies, such as mere larceny from the person, etc., the party attacked is under no obligation to retreat; but he may, in such case, if necessary, stand his ground and kill his adversary.

8. *Same; law of, when accused assailed with deadly weapon.*—This principle, however, when applied to an attack made with a deadly weapon, must be limited to those cases, in which the attack with the deadly weapon is made under such circumstances as to reasonably justify the conclusion, that the party assailed, by retreating, will apparently put himself at a disadvantage.

9. *Same; reasonable belief of imminent peril, and of urgent necessity to take life.*—To enable one charged with homicide to make out a case of self-defense, the circumstances surrounding him at the time of the fatal act must be such as to have created in his mind a reasonable belief, well founded and honestly entertained, of his own present and immediate imminent peril, and of an urgent necessity to take the life of his assailant, as the only alternative of saving his own, or of preventing the infliction of great bodily harm; and of the existence of these facts the jury must be the judge.

10. *Personal property taken without criminal intent; law of recapture.*

[Storey v. The State.]

Where personal property is converted, or taken possession of in such manner as to constitute merely a civil trespass, without any criminal intent, it is not lawful to recapture it by the exercise of any force which would amount even to a breach of the peace, much less a felonious homicide.

11. *The right to take life to prevent the commission of a felony ; limitation to rule.*—Although it has often been stated, in general terms, by text writers, and in many well considered cases, that one may " oppose another who is attempting to perpetrate *any felony*, to the extinguishment, if need be, of the felon's existence," the rule as thus stated is neither sound in principle, nor supported by the weight of modern authority; but the safe view is, that the rule does not authorize the killing of persons attempting *secret* felonies, not accompanied by *force.*

12. *Same ; when the killing of one attempting to commit larceny of a horse, not justifiable.*—Where, on the trial of a prisoner for murder, one of the defenses relied on was, that he was in pursuit of the deceased, at the time of the homicide, for the purpose of recapturing a horse, which had been stolen from him by the deceased, and that the killing was necessary to a recovery of the horse, it being shown that the alleged larceny, if it occurred at all, was committed in the day time, and it not being shown that the prisoner was unable to obtain his redress at law,—*held,* that the refusal of the court to charge the jury, at the prisoner's request, that if the horse was feloniously taken and carried away by the deceased, and there was an apparent necessity for killing the deceased, in order to recover the horse, and prevent the consummation of the larceny, the homicide would be justifiable, is free from error, although the larceny of a horse, without regard to value, is a felony under the statute.

13. *Right of pursuit and recapture of stolen property, as applicable to law of homicide.*—If, however, the horse was in fact stolen by the deceased, the prisoner, or any other person, without informing the deceased of his purpose, had the right to pursue him for the purpose of arresting him, and of recapturing the stolen property ; and, if resisted, had the right to repel force by force, and was not required to give back or retreat; and if, under such circumstances, the deceased was killed, the homicide would be justifiable.

14. *Same.*—If, in such case, the prisoner's purpose was honestly to make pursuit, he would not for this reason be chargeable with the imputation of having wrongfully brought on the difficulty ; but the law would not permit him to resort to the pretense of pursuit, as a mere colorable device, beneath which to perpetrate crime.

15. *Character of deceased ; when a vital issue.*—While " no one can, without lawful excuse, kill a blood-thirsty ruffian any more than he can the most orderly citizen;" yet, an overt act done by the former may reasonably justify prompter action, as a necessary means of self-preservation, than if done by the latter; and hence, in all cases of homicide, in which an issue of self-defense properly arises, the character of the deceased is a vital issue.

APPEAL from Talladega Circuit Court.

Tried before Hon. LeRoy F. Box.

At the July term, 1881, of said court, Phil, *alias* Philip Storey, and William Storey, were jointly indicted for the murder of Josiah Hall; and at a subsequent term they were tried, the jury returning the following verdict, as recited in the judgment-entry: " We, the jury, find the defendant William Storey not guilty, and find the defendant Philip Storey guilty, and sentence him to the penitentiary for two years."

The evidence introduced on behalf of the State tended to

show, that, on the morning of the — day of May, 1881, Philip Storey and Josiah Hall, the deceased, met at the store of one Thomas, in Talladega county, said Storey riding a horse and Hall, a mule; that Hall "endeavored" to trade his mule for Storey's horse, but that no trade was then made, Storey on advice of Thomas leaving the store on his horse; that about two hours afterwards Storey "came by the house of McMerriam, a State's witness," riding a mule, and accompanied by his son, William Storey, a lad about seventeen years of age, and asked McMerriam, whether he had seen Josiah Hall pass that way, "stating that Hall had stolen his (Storey's) horse, and he meant to get it back, or kill Hall;" that McMerriam having advised him to get a warrant of arrest for Hall, said Philip sent his son on the mule to the house of one Woods, a white man, and said Philip's landlord, to ask him to come and aid him in recovering his horse; "he (Philip Storey) following on in the direction of Bobo's, a justice of the peace;" that at a cross-road, in front of the house of one Sullivan, the deceased, who was riding the horse which Philip Storey had ridden to Thomas' store that morning, and was going in the direction of Bobo's, saw William Storey coming behind him on a mule, and said to him, with an oath, "are you following me up;" that William Storey said "halt," and thereupon the deceased turned in his saddle, and fired at said William with a double-barrel shot-gun, shooting him "through the right shoulder just above the lungs;" that said William got down from the mule which he was riding, and fell, Hall going on in the direction of Bobo's; and that said William was carried into Sullivan's yard, and placed on a pallet. The evidence for the State further tended to show, that in a few minutes thereafter Philip Storey came up to the place where his son was lying, and, having been informed how the shooting occurred, said that he would kill Hall, "if he (Hall) was on top of dirt;" and asked some one to load his gun; that being informed that one barrel of his gun was loaded, and being advised to go to the house of Bobo, the justice of the peace, and get a warrant for Hall's arrest, he started off in that direction; that a few minutes after he left, the deceased, Bobo, and one White rode up from the direction of Bobo's house, and stopped in Sullivan's yard; Bobo and White dismounting, but the deceased remaining on his horse, with his gun across his saddle in front of him; that about twenty minutes afterwards, one of a crowd who had gathered around the place where William Storey was lying, exclaimed, "yonder comes Phil," and "in an instant Philip Storey came around Sullivan's house and dismounted," and waving his hand, said "clear the way:" and that the deceased also dismounted. Who dismounted first, Philip Storey, or the deceased, the testimony of the State's

[Storey v. The State.]

witnesses was conflicting, some testifying that the former, others that the latter did.    The evidence for the State further tended to show that when both had dismounted, Philip Storey advanced on Hall, who was standing by the horse he had been riding, with his gun across the horse's haunches; "that Hall moved his horse about to keep an obstruction between himself and Philip; that when Philip got around the head of the horse, Hall turned and ran towards Sullivan's door; that Philip fired and shot Hall in the back below the right shoulder, and Hall fell, and immediately after he fell, Philip struck him on the head with his gun; that when Philip came up and dismounted, William Storey cried out, 'shoot him, father, he has killed me;' that after Philip fired and Hall fell, William ran and grabbed Hall's gun, and struck him a blow on the neck, fracturing the stock of the gun; that Josiah Hall died in a short while from the effects of said wounds;" and that Philip Storey, on being immediately thereafter arrested by Bobo, said, with an oath, that he had done what he had come there to do.    "The State proved further by a brother-in-law of Hall, that that morning, before the shooting of William Storey, Hall had told witness that he had traded horses with Philip Storey, and had paid him $15 to boot; that Philip was dissatisfied, and he gave him another dollar, and that Philip wadded up all the money, and threw it into the creek, demanding his horse back; and that Hall said that Philip Storey and his boy were after him, and he was going to get a peace warrant for them from Bobo."    It was also shown that several of the State's witnesses had testified touching the circumstances attending the killing of the deceased, on a preliminary examination, and that their testimony on that examination "was contradictory of their present testimony in many important particulars."

"The evidence for the defendants tended to show that on the day of the shooting, Hall came up to the fence where two of defendants' witnesses were at work, and asked where Philip Storey was; that when informed that witnesses did not know, Hall said, 'Phil has told me that he was going to get a warrant for me for stealing his horse, but,'" with an oath, "'I am going to kill him before he does it,' and Hall then rode off; and that shortly afterwards Philip Storey came up, and was told by witnesses what Hall had said."    The evidence for the defendants further tended to show that, upon some one in the crowd around the place where William Storey was lying in Sullivan's yard, saying, "Yonder comes Phil," Hall "dismounted from Philip Storey's horse, which he was riding, and made preparation to shoot, as Philip Storey was dismounting; that he cocked his gun before Philip Storey got down from the mule he was riding, and that he snapped a cap on the barrel of his

[Storey v. The State.]

gun before Philip Storey shot;" that "the door of Sullivan's house, towards which Hall had turned, or was in the act of turning, when Philip fired, was only two or three steps from where Hall had been standing when he cocked his gun and laid it over his horse as Philip came up;" that during the encounter between Philip Storey and Hall, William Storey was lying on the pallet in Sullivan's yard, "in a semi-conscious state, and did not rise therefrom, or strike Hall," and was then physically unable to have dealt the blow testified to by the State's witnesses. The testimony for the defendants further tended to show that "Philip Storey was and has been all his life of good character, peaceable, quiet and inoffensive; and that Josiah Hall was a man of very bad character—a quick, revengeful, desperate, dangerous, violent, and turbulent man, and was so considered by all who knew him." The bill of exceptions also contains this statement: "The defendants' evidence tended to show that Philip Storey did not provoke the difficulty, and, at the time of the killing of Hall, was acting in self-defense; that of the State tended to show that Philip Storey did provoke the difficulty, and that Hall was retreating when Philip Storey shot him." The killing was shown to have been done in Talladega county, and before the finding of the indictment. The foregoing, as recited in the bill of exceptions, "was, in substance, all the evidence tended to show."

After the general charge, to which no exceptions were taken, had been delivered, the Circuit Court gave to the jury, at the request of the State's solicitor, nine charges, to the giving of which the appellant duly excepted. He also reserved exceptions to the refusal of the court to give eight charges requested by the defendants. Among the charges requested by the defendant and refused by the court was one instructing the jury, in substance, that the defendant had the right to show the violent, dangerous, overbearing and turbulent character of the deceased, if he could, for the purpose of illustrating his own conduct in shooting the deceased; and that, if they find that Hall was a man of such bad .character, "then defendant was authorized to act upon less appearances of an intention to harm him, than would usually justify him." The purport of the other charges to which exceptions were reserved, and the questions raised by the rulings thereon, so far as passed on by this court, are sufficiently indicated in the opinion.

HEFLIN, BOWDEN & KNOX and PARSONS & PARSONS, for appellant.

H. C. TOMPKINS, Attorney-General, for the State.

(No briefs came to the hands of the reporter.)

SOMERVILLE, J.—The judgment of conviction in this case must be reversed because of several errors apparent in the record.

In the first place, the verdict of the jury finds the defendant guilty generally, without *specifying the degree of the homicide.* The Code requires that "when the jury find the defendant guilty, under an indictment for murder, *they must ascertain, by their verdict, whether it is murder in the first or second degree.*"—Code, 1876, § 4299. Our decisions have been uniform in holding that no judgment of conviction, under an indictment for murder, can be sustained, unless the verdict of the jury expressly finds the degree of the crime of which the defendant is convicted.—*Levison v. The State,* 54 Ala. 520; *Field's case,* 47 Ala. 603; *Murphy's case,* 45 Ala. 32; *Hall's case,* 40 Ala. 698; *Cobia v. The State,* 16 Ala. 781.

The oath of the jury was, furthermore, defective, as it appears in the record. The recital is, that they were "sworn and charged *well and truly to try the issue joined."* The record thus purports to set out the whole oath, and fails to do so by omitting a material part of it. The omitted phrase—"and a true verdict render according to the evidence, so help you God"—is an essential ingredient, being expressly required by statute.—Code, § 4765. The past rulings of this court on this subject are irreconcilably conflicting, as will appear from the cases cited in Clark's Cr. Dig. § 574; and Clark's Man. Cr. Law, §§ 2136, 2960. We adhere, however, to the more recent rulings, as declared in the cases of *Allen v. The State, ante,* p. 5, and *Schamberger v. The State,* 68 Ala. 543. The rule, as there settled, is that where a judgment entry purports to set out the full oath administered to the jury, it must express every *essential element or ingredient of such oath,* as prescribed by the statute. But a recital that the jury "were duly sworn," or were "sworn according to law" is clearly sufficient, and we have often said that it is the safer practice for the *nisi prius* courts to pursue.—*Roberts v. The State,* 68 Ala. 515; *Mitchell's case,* 58 Ala. 417; *Moore's case,* 52 Ala. 424; *Smith's case,* 53 Ala. 486; Clark's Cr. Dig. § 574; *Commander v. The State,* 60 Ala. 1.

The prisoner, as shown by the bill of exceptions, requested the court to give the following written charge, which was refused: "If there is a *conflict in the testimony* of the witnesses offered by the State, and those offered by the defendants, *the jury must determine* which of said witnesses they will believe; and in determining *what weight* they will attach to the testimony of any particular witness, they may look to *the manner*

of such witness on the stand, and to *his interest and feeling* (if any) in the case, and as to whether or not he *has been contradicted by other witnesses* in the cause, or by *his own previous statements.*" The refusal of this charge was clearly erroneous. It always falls within the province of a jury to determine the weight and sufficiency of the evidence, including the credibility of the various witnesses.—1 Greenl. Ev. § 49; *Myers' case*, 62 Ala. 599; *Alsabrooks' case*, 52 Ala. 24. This must be done, however, "under such instructions, as to the reason of the case, as may be given by the court."—Whart. Cr. Ev. § 384. The usual tests of credibility are various, and need not be here enumerated, but among these may very certainly be included the *manner of the witness* on the stand; his state of prejudice as affected by *interest* or *feeling* evinced in behalf of either party; *the consistency of his statements* with those of *other witnesses* examined in the cause, or their repugnancy or harmony with *his own previous statements* made in the cause, or elsewhere. The charge recognized these elementary principles, and should have been given.—Whart. Cr. Ev. §§ 373, 354; 1 Greenl. Ev. §§ 461, *et seq.*

It is one of the fundamental principles of the law of homicide, whenever the doctrine of self-defense arises, that the accused himself *must always be reasonably free from fault*, in having provoked or brought on the difficulty in which the killing was perpetrated. If the accused was the aggressor, it is well settled that he can not be heard to urge, in his own justification, a necessity for the killing which was produced by his own wrongful act.—*Cross' case*, 63 Ala. 40; *Kimbrough's case*, 62 Ala. 248; Whart. on Hom. § 535. Or, as sometimes stated, no one can avail himself of a necessity which he has knowingly and willfully brought on himself."—*Leonard's case*, 66 Ala. 461; 1 Bish. Cr. Law, § 844. Many of the numerous charges requested by the prisoner, as will readily appear from inspection, were properly refused on the ground that they ignored this preliminary principle.

It is another important rule in such cases, that the right of self-defense does not arise until the defendant has availed himself of all proper means in his power *to decline the combat by retreat*, provided there be open to him a safe mode of escape. *Ingram's case*, 67 Ala. 67; *Eiland's case*, 52 Ala. 322. Such, at least, is the settled principle governing cases of mere assault, or of mutual combat, where the attacking party, as expressed by Mr. Bishop, has not "the *purpose of murder* in his heart." 1 Bish. Cr. Law, § 850. Where, however, the assault is manifestly *felonious in its purpose and forcible in its nature*, as in murder, rape, robbery, burglary, and the like, as distinguished from *secret* felonies, like mere larceny from the person, or the

[Storey v. The State.]

picking of one's pocket, the party attacked is under no obligation to retreat. But he may, if necessary, stand his ground and kill his adversary.—Cases on Self-Defence (Horr. & Thomp.), pp. 33, 133, 139; *Selfridge's case, Ib.* 1; *State v. Shippey,* 10 Minn. 223; 1 Bish. Cr. Law, § 850; *Aaron v. The State,* 31 Ga. 167; 1 East P. C. 271. Mr. Bishop observes, that "it is the same *where the attack is with a deadly weapon;* for, in this case, the person attacked may well assume that the other intends murder, whether he does in fact or not."—1 Bish. Cr. L. § 850. This observation, however, must be limited to those cases where the attack with the deadly weapon is made under such circumstances or surroundings as to reasonably justify the conclusion that the party assailed, by retreating, will apparently put himself at a disadvantage; for, as Mr. Blackstone has it, he should retreat "as far as he *conveniently* and *safely* can to avoid the violence of the assault, before he turns on his assailant." 4 Com. 184; Whart. on Hom. § 485; *Selfridge's case, supra;* Cases on Self-Defence, 64, 121, 130. Mr. East states the doctrine as follows: "A man may repel force by force in defense of his person, habitation, or property, against one who manifestly intends, or endeavors, *by violence or surprise,* to commit a known felony, such as murder, rape, robbery, arson, burglary, and the like, upon either. In these cases *he is not obliged to retreat,* but may pursue his adversary until he has secured himself from all danger; and if he kill him in so doing, it is called justifiable self-defense."—1 East P. C. 271.

Of course, where one is attacked in his own dwelling-house, he is never required to retreat. His "house is his castle," and the law permits him to protect its sanctity from every unlawful invasion.—Whart. on Hom. § 541; *Pond's case,* 8 Mich. 150; 1 Russ. Cr. 544.

These principles are of easy application to the evidence, and some of the charges were misleading in failing to clearly recognize them.

The law requires that the circumstances surrounding the prisoner should have created in his mind *a reasonable belief of his own imminent peril,* and of *an urgent necessity to take the life* of his assailant, as the only apparent alternative of saving his own life, or else of preventing the infliction of great bodily harm. Such peril must be, to all appearances, present and immediate, and the belief in the necessity of killing must be well founded and honestly entertained; and of these facts the jury must be the judge.—*Carroll's case,* 23 Ala. 28; *Oliver's case,* 17 Ala. 587; *Ex parte Brown,* 65 Ala. 446; Cases on Self-Def. (Horr. & Thomp.), 345, 349, 476, 820; Whart. on Hom. § 517 *et seq.; Mitchell's case,* 60 Ala. 26; *Robert's case,* 68 Ala. 156. The charges given by the court fully recognize this principle.

22

[Storey v. The State.]

The record contains some evidence remotely tending to show that the prisoner was in pursuit of the deceased for the purpose of recapturing a horse, which the deceased had either *stolen*, acquired by *fraud*, or else unlawfully *converted* to his own use.

If the property was merely converted, or taken possession of in such manner as to constitute a civil trespass, without any criminal intent, it would not be lawful to recapture it by any exercise of force which would amount even to a breach of the peace, much less a felonious homicide.—*Street, v. Sinclair, ante*, p. 110 ; *Burns v. Campbell, ante*, p. 271.

Taking the hypothesis that there was a *larceny* of the horse, it becomes important to inquire what would then be the rule. The larceny of a horse is a *felony* in this State, being specially made so by statute, without regard to the value of the animal stolen.—Code, 1876, § 4358.    The fifth charge requested by the defendant is an assertion of the proposition, that if the horse was feloniously taken and carried away by the deceased, and there was an apparent necessity for killing deceased in order to recover the property and prevent the consummation of the felony, the homicide would be justifiable.    The question is thus presented, as to the circumstances under which one can kill in order to prevent the perpetration of a larceny which is made a felony by statute—a subject full of difficulties and conflicting expressions of opinion from the very earliest history of our common law jurisprudence.    The broad doctrine intimated by Lord Coke was, that a felon may be killed to prevent the commission of a felony without any inevitable cause, or as a matter of mere choice with the slayer.—3 Inst. 56.    If such a rule ever prevailed, it was at a very early day, before the dawn of a milder civilization, with its wiser system of more benignant laws ; for Blackstone states the principle to be, that "where a crime, in itself *capital*, is endeavored to be committed *by force*, it is lawful to *repel that force* by the death of the party attempting." 4 Com. 181.    The reason he assigns is, that the law is too tender of the public peace and too careful of the lives of the subjects to "suffer, with impunity, any crime to be *prevented* by death, unless the same, if committed, would also be *punished* by death."    It must be admitted that there was far more reason in this rule than the one intimated by Lord Coke, although all felonies at common law were punishable by death, and the person killing, in such cases, would seem to be but the executioner of the law.    Both of these views, however, have been repudiated by the later authorities, each being to some extent materially modified.    All admit that the killing can not be done from *mere choice ;* and it is none the less certain that the felony *need not be a capital one* to come within the scope of the rule. *Gray v. Combs,* 7 J. J. Marsh. 478 ; Cases on Self-Defence (Horr.

[Storey v. The State.]

& Thomp.), 725, 867; *Oliver v. The State*, 17 Ala. 587; *Carroll v. The State*, 23 Ala. 28.

We find it often stated, in general terms, both by text writers and in many well considered cases, that one may, as Mr. Bishop expresses it, "oppose another who is attempting to perpetrate *any felony*, to the extinguishment, if need be, of the felon's existence."—1 Bish. Cr. Law, §§ 849–50; *The State v. Rutherford*, 1 Hawks, 457. It is observed by Mr. Bishop, who is an advocate of this theory, that "the practical carrying out of the right thus conceded, is, in some circumstaces, *dangerous*, and wherever admitted, it *should be carefully guarded*." 1 Bish. Cr. Law, § 855.

After a careful consideration of the subject we are fully persuaded that the rule, as thus stated, is neither sound in principle, nor is it supported by the weight of modern authority. The safer view is that taken by Mr. Wharton, that the rule *does not authorize the killing of persons attempting* SECRET *felonies, not accompanied by* FORCE.—Whart. on Hom. § 539. Mr. Greenleaf confines it to "the prevention of any *atrocious crime* attempted to be *committed by force;* such as murder, robbery, house-breaking in the night-time, rape, mayhem, or any other act of felony against the person" (3 Greenl. Ev. 115); and such seems to be the general expression of the common law text writers.—1 Russ. Cr. 665–70; 4 Black. Com. 178–80; Whart. Amer. Cr. Law, 298–403; 1 East P. C. 271; 1 Hale, P. C. 488; Foster, 274. It is said by the authors of Cases on Self-Defence, that a killing which "appears to be reasonably necessary to prevent a *forcible and atrocious* felony against property, is justifiable homicide." "This rule," it is added, "the common law writers do not extend to *secret* felonies, or felonies not accompanied with force," although no modern case can be found expressly so adjudging. They further add: "It is pretty clear that the right to kill in defense of property *does not extend to cases of larceny*, which is a crime of a secret character, although the cases which illustrate this exception are generally cases of theft of articles of small value."—Cases on Self-Defence (Horr. & Thomp.), 901–2. This was settled in *Reg. v. Murphy*, 2 Crawf. & Dix C. C. 20, where the defendant was convicted of shooting one detected in feloniously carrying away fallen timber which he had stolen from the premises of the prosecutor, the shooting being done very clearly to prevent the act, which was admitted to be a felony. DOHERTY, C. J., said: "I can not allow it to go abroad that it is lawful to fire upon a person committing a trespass and larceny; for that would be punishing, perhaps with death, offenses for which the law has provided milder penalties." This view is supported by the following cases: *State v. Vance*, 17 Iowa, 144; *McClelland v. Kay*,

[Storey v. The State.]

14 B. Monroe, 106, and others not necessary to be cited. See Cases on Self-Defence, p. 901, *note.*

There is no decision of this court, within our knowledge, which conflicts with these views. It is true the rule has been extended to statutory felonies, as well as felonies at common law, which is doubtless the correct doctrine, but the cases adjudged have been open crimes committed by force, and not those of a secret nature.—*Oliver's case,* 17 Ala. 587; *Carroll's case,* 23 Ala. 28; *Dill's case,* 25 Ala. 15.

In *Pond v. The People,* 8 Mich. 150, after endorsing the rule which we have above stated, it was suggested by CAMPBELL, J., that there might possibly be some "exceptional cases" not within its influence, a proposition from which we are not prepared to dissent. And again in *Gray v. Combs,* 7 J. J. Marsh. 478, 483, it was said by NICHOLAS, J., that the right to kill in order to prevent the perpetration of crime should depend "more upon the character of the crime, and the *time and manner* of its attempted perpetration, than upon the degree of punishment attached by law." There is much reason in this view, and a strong case might be presented of one's shooting a felon to prevent the asportation of a stolen horse in the *night time,* where no opportunity is afforded to recognize the thief, or obtain speedy redress at law. Both the Roman and Athenian laws made this distinction in favor of preventing the perpetration of theft by night, allowing, in each instance, the thief to be killed when necessary, if taken in the act.—4 Black. Com. 180, 181.

The alleged larceny in the present case, if it occurred at all, was in the open daylight, and the defendant is not shown to have been unable to obtain his redress at law. Where opportunity is afforded to secure the punishment of the offender by due course of law, the case must be an urgent one which excuses a killing to prevent any felony, much less one not of a forcible or atrocious nature.—Whart. Hom. §§ 536–8. "No man, under the protection of the law," says Sir MICHAEL FOSTER, "is to be the avenger of his own wrongs. If they are of such a nature for which the law of society will give him an adequate remedy, thither he ought to resort."—Foster, 296. It is everywhere settled that the law will not justify a homicide which is perpetrated in resisting a mere civil trespass upon premises, . . . . . . . . . .

. . . . 7; What on . . . . . the reason . . . the protection of . . . . . . . . . . importance . . . the protection of property. The law may afford . . . . . . . . for the loss of the one, while it utterly fails to . . . . for the one.

The rule we have above declared is the safer one, because it

better comports with the public tranquility and the peace of society. The establishment of any other would lead to disorderly breaches of the peace of an aggravated nature, and therefore tend greatly to cheapen human life. This is especially true in view of our legislative policy which has recently brought many crimes, formerly classed and punished as petit larcenies within the class of statutory felonies. It seems settled that no distinction can be made between statutory and common law felonies, whatever may be the acknowledged extent of the rule. *Oliver's case*, 17 Ala. 587; Cases on Self-Def. 901, 867; Bish. Stat Cr. § 139. The stealing of a hog, a sheep, or a goat is, under our statute, a felony, without regard to the pecuniary value of the animal. So would be the larceny of a single ear of corn, which is "a part of any outstanding crop."—Code, §. 4358; Acts 1880–81, p. 47. It would be shocking to the good order of government to have it proclaimed, with the sanction of the courts, that one may, in the broad daylight, commit a willful homicide in order to prevent the larceny of an ear of corn. In our judgment the fifth charge, requested by the defendant, was properly refused.

It can not be questioned, however, that if there was in truth a larceny of the prisoner's horse, he, or any other private person had a lawful right to pursue the thief for the purpose of arresting him, and of recapturing the stolen property.—Code, §§ 4668–70; 1 Bish. Cr. Proc. §§ 164–5. He is not required, in such case, to inform the party fleeing of his purpose to arrest him, as in ordinary cases.—Code, § 4669. And he could, if resisted, repel force with force, and need not give back, or retreat. If, under such circumstances, the party making resistance is unavoidably killed, the homicide would be justifiable. 2 Bish. Cr. Law, § 647; 1 Russ. Cr. 665; *State v. Roane*, 2 Dev. 58. If the prisoner's purpose was honestly to make a pursuit, he would not for this reason be chargeable with the imputation of having wrongfully brought on the difficulty; but the law would not permit him to resort to the pretense of pursuit, as a mere colorable device, beneath which to perpetrate crime.

The character of the deceased was clearly a vital issue, as it is in all cases where an issue of *self-defense* properly arises. It was relevant as having a tendency to justify the belief in the prisoner's mind of a peril enhanced by the dangerous character of his assailant. A ferocious, vindictive and turbulent man is reputed to be such, because of the frequency with which he executes his revenge, or gives expression, by constant overt acts, to his animosity. A demonstration on his part, especially when preceded by recent and violent threats, may create reasonable apprehension of danger, when the same conduct on the part of

[Tucker v. The State.]

a notoriously peaceable or timid man would be regarded as entirely harmless. It is quite true that no one can, without lawful excuse, kill a blood-thirsty ruffian any more than he can the most orderly citizen; but it is plain that an overt act done by the former may reasonably justify prompter action, as a necessary means of self-preservation, than if done by the latter. It may sometimes be as material to prove that a man, who assailed you, was a Thug in character, as that he was a Thug in reality. Whart. on Hom. § 606; *Robert's case,* 68 Ala. 156; *Pritchett's case,* 22 Ala. 39; *Dupree v. State,* 33 Ala. 38; *Franklin's case,* 29 Ala. 14; *Stokes' case,* 53 N. Y. 164; *Colton's case,* 31 Miss. 504; Cases Self-Defense (Horr. & Thomp.), pp. 486, 667, 641, 635, 927, 539.

There are some other questions raised in the record which we do not think necessary to discuss. The judgment of the Circuit Court must be reversed, and the cause remanded for a new trial. In the meanwhile, the prisoner will be retained in custody until discharged by due process of law.